Srabana GUPTA, Plaintiff-Appellee,

v.

FLORIDA BOARD OF REGENTS, et al.,  Defendants-Appellants.

No. 98-5392.

United States Court of Appeals,

Eleventh Circuit.

May 17, 2000.

Appeal from the United States District Court for the Southern District of Florida.(No. 96-06690-CV-KMM), K. Michael Moore, Judge.

Before ANDERSON, Chief Judge, CARNES, Circuit Judge, and RONEY, Senior Circuit Judge.

CARNES, Circuit Judge:

The Florida Board of Regents ("Board") appeals from a judgment entered against it pursuant to a jury verdict in this sexual harassment and retaliation case.  The jury returned a verdict in favor of the plaintiff, Dr. Srabana Gupta, finding that the Board was liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* to Gupta for sexual harassment she suffered while employed as a professor at Florida Atlantic University ("University").  The jury also found that the Board had violated Title VII by retaliating against Gupta because she complained about the alleged sexual harassment to the University, and because she filed a sexual harassment charge with the United States Equal Employment Opportunity Commission ("EEOC").

The district court denied the Board's post-verdict motion for judgment as a matter of law on both claims.  We conclude that there was insufficient evidence to support the jury's verdict on either the sex discrimination or the retaliation claim, and the district court should have granted the Board judgment as a matter of law on both claims.  Consequently, we reverse the judgment of the district court and remand the case for entry of judgment in favor of the Board.

## I. BACKGROUND

*A. The General Facts*

Plaintiff Dr. Srabana Gupta[1] is a citizen of India. In 1988 wishing to further her education, she came to the United States on a student visa and studied at the University of Florida, where she earned a Ph.D. in economics in August of 1994. She remains in the United States on a work visa.

Gupta applied in the spring of 1994 for a position as a tenure track assistant professor of economics at Florida Atlantic University. Following the University's procedure, she sent her application directly to Dr. Rupert Rhodd, a native of Jamaica, who was at the time an associate professor of economics and chairman of the search committee for the position she sought. Rhodd met Gupta at the Fort Lauderdale airport in late April or early May of 1994 when she arrived for her interview with the University's search committee. During Gupta's interview weekend, Rhodd was responsible for accompanying her to meetings, including lunch and dinner with other faculty members.

A few weeks after the interview Gupta called Dr. Neela Manage, a member of the search committee, to ask whether the University had decided whom they were going to hire for the position. Manage responded that the committee had not yet decided. A few days later, Rhodd called Gupta and said that the search committee was going to meet later that day and that he thought they were going to choose her for the position. Rhodd called her back in a couple of hours and informed her that the search committee had decided to hire her for the position. Prior to Gupta's acceptance of the assistant professor position, Rhodd, at Gupta's request, negotiated a salary increase for her from $35,000 to $40,000.

Soon thereafter, Gupta planned another trip to Fort Lauderdale to locate an apartment. Rhodd arranged Gupta's hotel reservations, drove her around the city because she did not know her way, and helped her find an apartment and inexpensive furniture. During this trip, Gupta also met with Dr. Sarah Ransdell, a member of the search committee who, along with Rhodd, showed Gupta around the Fort Lauderdale area.

---

[1]All the main characters in this case have Ph.D. degrees and can be referred to with the title "Dr." before their name. However, in order to avoid "doctoring up" the opinion, we will refer to each of them once with that title and then only by the proper name. The only exceptions will be references in quoted testimony.

2

Gupta joined the University's faculty as an assistant professor of economics in August of 1994 on the Davie campus. Her position was within the Social Sciences Division of the College of Liberal Arts. During the 1994-95 school year, Rhodd was the coordinator of the Social Sciences Division for the Davie campus. One of his responsibilities was coordinating the schedules of courses taught by each of the professors in the Social Sciences Division.

*B. Facts Relating to the Sexual Harassment Claim*[2]

When Rhodd first met Gupta at the airport when she arrived for her initial interview, Gupta perceived that he "looked [ ] me up and down." Later that afternoon, Rhodd suggested that he, Gupta, and Neela Manage, co-chairman of the economics department and Associate Dean of the College of Social Sciences, have lunch at a Hooters restaurant, but they did not actually go there. Instead, at the suggestion of Manage, they had lunch at Houston's Restaurant. After a tour of the University's Boca Raton campus and interviews with several professors, Rhodd and Sarah Ransdell took Gupta to dinner at Mango's, which Gupta described as "a bar." Rhodd suggested that Gupta change into casual attire before dinner.

In August of 1994, after accepting the associate professor position, Gupta returned to Fort Lauderdale to look for an apartment. During this trip, Rhodd looked at her when she took off her jacket, which made her very uncomfortable. He also accompanied Gupta, Sarah Ransdell, and Ransdell's boyfriend to dinner at Shooters, which Gupta describes as "a bar" and "a place where single people meet." After Gupta was hired, Rhodd was very supportive of Gupta and often went "out of his way" to help her. He told her, "If you need anything, just come and talk to me. If you have any problem, come and talk to me." After Gupta complained about the size of her office, Rhodd moved her from a smaller office directly across from his office to a larger

---

[2]When reviewing for sufficiency of the evidence to support the verdict, we set out the facts in the light most favorable to the nonmoving party. *See Morro v. City of Birmingham,* 117 F.3d 508, 510 n. 1, 513 (11th Cir.1997). Some of the facts concerning the alleged sexual harassment and retaliation were hotly contested at trial, but for present purposes we assume that all of Gupta's testimony, and any other evidence favoring her position, is true. Where her testimony consisted of her characterizations of an event, we identify it as such.

office. He also volunteered to drop Jamaican food off by her house when she asked where she could find spicy food, but she declined his offer. Rhodd and Gupta did pick up Jamaican food one day and bring it back to the campus to eat for lunch.

Soon after Gupta arrived in August, Rhodd began calling her at her home at night. As Gupta described it in her testimony:

> [H]e used to call me at home.... Quite frequently—two times, three times, you know, a week on an average.... He would call me either late at night, because often 9:30, 10:00 o'clock at night, or over the weekends.... He said, "Are you talking to your boyfriend? Where is your boyfriend?"

His phone calls continued until January of 1995. In one of the calls, Rhodd asked Gupta, "I was wondering how you were doing?" During some of these evening phone calls, Rhodd asked if she was in bed. He also called her one Sunday morning and informed her that he was going to be the new Associate Dean of the College of Liberal Arts. He told her that "as an economist now, [she had] to take up more responsibilities."

Rhodd also frequently asked Gupta to have lunch with him. At first, Gupta had lunch with Rhodd almost every day, but later she began having lunch with other colleagues. Gupta thought that Rhodd was upset when she went to lunch with other people. Rhodd started telling Gupta, "Well, you know, I know with whom you went to lunch, with," and "You don't go to lunch with me any more." He commented that some of the faculty members that Gupta had lunch with were "racist" and "evil." Once when she was wearing a skirt that was above her knee, she perceived that Rhodd "was staring at [her] legs." It made her "uncomfortable" and since that time she has "never worn a short skirt."

Once when Gupta was in Rhodd's office discussing her teaching schedule, as she described it, he "just rolled his chair and came close to me and he put his hand on my right thigh." His hand was partly on the inside of her thigh. It happened very quickly, and Gupta moved away very quickly. On another occasion, Rhodd touched her bracelet and said, "Oh, it is a very nice bracelet." Another time, he touched a ring Gupta was wearing.

4

On another occasion when Gupta went into Rhodd's office, "he suddenly rolled his chair towards [her] and he said, 'What kind of material is that?' and he lifted the hem of [her] dress" about four inches with his hand. She instinctively stepped back. Another day, when the air conditioning was broken and it was very hot, Rhodd was expecting Gupta to come pick up a book from his office. Gupta entered Rhodd's office and discovered that he had on his undershirt, but had taken his dress shirt off. She offered to come back to see him later, but he said to wait and at the same time "he unbuckled his belt and pulled down his zipper and start[ed] tucking his [dress] shirt in." She thanked him for the book and left.

Rhodd also made some comments to Gupta that she characterized as harassment. He told her that the reason she was assigned to teach more hours than other teachers and the reason she had not received her new computer was that "people here are racist."[3] Once Dr. Rhodd commented, "You are looking very beautiful." Twice he told her, "Indian people are really decent, and the Caribbean and Western people are really promiscuous. I can look at you and I can tell you are innocent and you don't have much experience." One morning after a bad thunderstorm the night before, Rhodd called Gupta and asked if she needed a ride to a University seminar. During that conversation, he said, "Oh, you were all by yourself on a dark and stormy night? Why didn't you call me? I would have come and spend [sic] the night with you." Gupta understood Dr. Rhodd's suggestion to mean "that he wanted to [have a] sexual relationship with me." She told him, "Don't talk to me that way. You are talking nonsense."

On one occasion, Rhodd stated that he considered men superior to women, that women are like meat, and that "men need variety in women." Once, Rhodd came into Gupta's office and asked her "Why do you look so unhappy? Have you fallen for a man you can't talk about?" She responded, "What are you talking about?" He replied, "I give you six months to fall for a man about which you won't be able to talk about." Gupta thought that Rhodd was referring to himself.

---

[3]Gupta never explained why she thought that statement amounted to harassment of her. She said she believed that these statements were made "to get me to his side, so that I know that this place is bad." She stated that these statements made her "very distressed" and "very upset."

Although no precise date is given in the record, Gupta apparently arrived at the University in or around August of 1994. When the case was tried in July and August of 1997, she was still employed as an assistant professor of economics at the University. However, the last time she spoke with or otherwise had anything directly to do with Rhodd was in or around February of 1995. His statements and actions about which she complains occurred during a period of six or seven months.

### C. Facts Relating to Gupta's Complaints Inside the University[4]

In 1994 Gupta confided in Ransdell that Rhodd had told her that certain people in the College of Liberal Arts were racist and that he would protect her. Ransdell assured her that these people were not racist. In November 1994, Gupta had another conversation with Ransdell in which she told her about Rhodd's comment that men are superior to women and his statement that he would have spent the night with Gupta during the storm. Ransdell told her: "Don't talk to anybody about it. Keep your mouth shut. I'm not going to tell it to anybody. And look for another job."

Gupta also talked with Dr. Ganson, a junior faculty member; Dr. Rose, a professor of history; Dr. Mona Domash, associate professor of economics; Dr. Lynn Appleton, a professor of sociology; and Neela Manage, the co-chairman of the Economics Department and the Associate Dean of the College of Social Sciences.[5] The first time she spoke with Manage was sometime in October of 1994. Gupta told Manage that she was distressed because Rhodd was calling her at home late at night and over the weekends and he was telling her that people at the University were racist. According to Gupta, she also told "her that there was more to it, but I did not mention anything much more than those things." Manage told her to "be very careful."

---

[4]*See supra* note 2.

[5]Gupta did not describe her conversations with Ganson or Rose. The record is unclear about what Gupta told Domash and Appleton, but it does reveal that they both advised Gupta to speak with one of the University's sexual harassment advisors.

Later that same month, Gupta went to Manage's office to talk to her again. Gupta began crying because she felt "unsafe and uncomfortable." She talked with Manage about the possibility of transferring to the Boca Raton campus. Manage told her that she saw no reason why Gupta could not apply for a position at the Boca Raton campus, but that Gupta should be careful because the decision-maker, Dr. Stronge, then the acting chairman of the Department of Economics, and "Doctor Rhodd, they're like this, they're very good friends." In December, Gupta again talked with Manage and told her about Rhodd "wanting to come and spend the night with me, [and] all of those incidents." Manage told Gupta that she should talk to Dean White, Dean of the College of Liberal Arts.

Thereafter, still in December of 1994, Gupta told Dean White that she was having some problems with Rhodd. She explained to him that Rhodd was giving her inaccurate information and telling her that it was not important that she attend certain meetings. White asked her if she would describe Rhodd's behavior as sexual harassment. As Gupta recounted, she responded, "I told him that I did not want to talk to him about the details at that point in time, but I told him that, you know, Doctor Rhodd was going out for promotion and I could have put him into lot [sic] of trouble if I wanted to. I told him that; that is, I gave him enough indication." White told her that, if it was of the nature of sexual harassment, "it's not going to stop that easily." Having read the University's policy against sexual harassment, Gupta thought if she "blew the whistle on Doctor Rhodd, that would really hurt his career," and she did not want to do that.

In January of 1995, Gupta heard a rumor that Rhodd was telling others that Gupta was not doing her job and should be fired. Gupta told Ransdell about the rumor, and Ransdell told her to "look for another job." Gupta met again with White and told him about the rumor she had heard. She also told White that Rhodd had been sexually harassing her. The record does not indicate what White said to Gupta in response.

Gupta met with one of the University's sexual harassment counselors, Debra Minney, in January of 1995. Minney informed Gupta that the University used two types of resolution proceedings, informal and formal. Gupta chose to attempt an informal resolution of her complaint against Rhodd. As part of the

7

informal resolution process, Dean White prepared a document in which he listed all of the specific allegations made by Gupta. Rhodd then responded to Gupta's allegations. Based on what Gupta and Rhodd said, White drew up a draft of the allegations which he hoped the parties would find mutually agreeable.

Because Gupta would not agree to sign White's draft, Ondina Felipe, the University's attorney, prepared a proposed informal settlement agreement which was presented to Gupta in March of 1995. Gupta was not satisfied with the proposal, so Paula Behul, the University's Director of Equal Opportunity Programs, requested that Gupta describe in writing the parts she found objectionable. Gupta had not responded by September of 1995. Behul then met with Gupta and requested that she formulate a response to the proposed agreement and present it to Behul on or before October 9, 1995. Gupta failed to meet that deadline. Because of what she considered to be Gupta's failure to cooperate in the informal resolution process, Behul closed the case on October 12, 1995.[6]

### D. Legal Proceedings

Gupta filed a charge of discrimination with the EEOC, and on April 10, 1996, a notice of a right to sue was issued to her. On June 25, 1996, Gupta filed a three-count complaint against Rhodd and the Florida Board of Regents in federal district court. The first count, which was brought pursuant to 42 U.S.C. § 1983, alleged that Rhodd had sexually harassed her "under color of state" law and had thereby deprived her of her rights under the Equal Protection Clause. The second count alleged that the Board was liable under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, for Rhodd's discriminatory conduct, and the third count alleged that the Board was also liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.,* on theories of hostile work environment and quid pro quo sexual harassment. Gupta filed an amended complaint on February 26, 1997, dropping the Title IX count but leaving the other two counts.

---

[6]We recount the facts relating to the allegedly retaliatory actions the University took against Gupta in our discussion of that claim. *See infra* Part II.B.

On May 6, 1997, Gupta filed a supplemental complaint adding another count against the Board. The new count alleged that after Gupta filed an internal complaint with the University and a formal complaint with the EEOC against the Board and Rhodd, the University unlawfully retaliated against her in violation of Title VII. Gupta's claims were tried and submitted to a jury. After four-and-one-half hours of deliberation, the jurors sent a note to the judge, which stated that they could not unanimously agree on the answers to the three questions on the first page of the verdict form.[7] In response, the district court gave the jury an *Allen* charge.[8]

Soon thereafter, the jury returned a verdict finding that Rhodd was not liable under 42 U.S.C. § 1983, but that the Board was liable under Title VII for sexual harassment and retaliation.[9] The jury awarded Gupta $45,000 in compensatory damages for the sexual harassment claim and $50,000 in compensatory damages for the retaliation claim. Following the entry of judgment, the Board renewed its earlier motion for judgment as a matter of law on both claims or, in the alternative, a new trial. The district court denied the Board's motion.[10] The Board appeals.

---

[7]Those three questions on the first page of the verdict form were as follows:

> 1. Do you find by a preponderance of the evidence that Defendant Florida Board of Regents is liable to Plaintiff for sexual harassment under Title VII of the Civil Rights Act of 1964 for hostile work environment and/or quid pro quo sexual harassment?

> 2. Do you find by a preponderance of the evidence that Defendant Florida Board of Regents retaliated against Plaintiff in violation of Title VII of the Civil Rights Act of 1964 for complaining about sexual harassment and filing a sexual harassment charge with the United States Equal Employment Opportunity Commission?

> 3. Do you find by a preponderance of the evidence that Defendant Rupert Rhodd, while acting under color of state law, intentionally deprived Plaintiff of her Constitutional rights under the Constitution of the United States?

[8]*See Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896).

[9]The jury answered the first two questions quoted in the preceding footnote "yes," and the third one "no."

[10]Among the arguments the Board made in its motion for judgment as a matter of law or new trial and repeats in this appeal is the contention that, because the jury found in favor of Rhodd on the § 1983 claim, the Board cannot be held liable for his actions under Title VII. Because we hold that the Board is entitled to

## II. DISCUSSION

We review the district court's denial of the Board's motion for judgment as a matter of law on both claims *de novo,* applying the same standard as the district court. *See Montgomery v. Noga,* 168 F.3d 1282, 1289 (11th Cir.1999). In applying that standard, "we review the evidence 'in the light most favorable to, and with all reasonable inferences drawn in favor of, the nonmoving party.' " *Montgomery,* 168 F.3d at 1289 (quoting *Walker v. NationsBank of Fla., N.A.,* 53 F.3d 1548, 1555 (11th Cir.1995)). We will not second-guess the jury or substitute our judgment for its judgment if its verdict is supported by sufficient evidence. *See Delpit v. Nocuba Shipping Co.,* 302 F.2d 835, 838 (5th Cir.1962).

### A. The Sexual Harassment Claim

Title VII states that it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Sexual harassment is a form of sex discrimination prohibited by Title VII. *See Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 2404, 91 L.Ed.2d 49 (1986) (stating that "[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' ").

There are two types of sexual harassment cases: (1) quid pro quo, which are "based on threats which are carried out" or fulfilled, and (2) hostile environment, which are based on "bothersome attentions or sexual remarks that are sufficiently severe or pervasive to create a hostile work environment." *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 751, 118 S.Ct. 2257, 2264, 141 L.Ed.2d 633 (1998). Although the jury in this case was instructed on both types of sexual harassment, construing the facts in the light most favorable to Gupta, we find that there was no evidence at all in the record to support a claim of quid pro quo sexual

judgment for other reasons, we need not address that contention.

10

harassment. Therefore, our discussion of Gupta's sexual harassment claim focuses on her theory of hostile environment sexual harassment.

This Court set forth in *Mendoza v. Borden, Inc.,* 195 F.3d 1238 (11th Cir.1999) (en banc), the elements that an employee must establish to support a hostile environment claim under Title VII based on harassment by a supervisor. An employee must establish:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Id.* at 1245.[11] The fourth element—that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment"—is the element that tests the mettle of most sexual harassment claims. Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code." *Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998). This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.' " *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998).

Accordingly, a plaintiff must establish not only that she subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *See Mendoza,* 195 F.3d at 1246; *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2284 (explaining that the

---

[11]The Supreme Court held in *Faragher v. City of Boca Raton,* 524 U.S. 775, 807, 118 S.Ct. 2275, 2292-93, 141 L.Ed.2d 662 (1998), that "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." There was sufficient evidence at trial from which a reasonable jury could conclude that Rhodd was Gupta's supervisor.

objective component of the "severe and pervasive" element prevents "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" from falling under Title VII's broad protections (citation omitted)). We have no doubt that Gupta subjectively perceived the alleged harassment to be severe and pervasive. However, the evidence presented at trial does not support a finding that from an objective viewpoint the alleged sexual harassment was so frequent, severe, or pervasive to constitute actionable sexual harassment under Title VII. *See Mendoza,* 195 F.3d at 1246 ("[t]he environment must be one that a reasonable person would find hostile or abusive ...." (citation and internal marks omitted)).

Although we examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute sexual harassment, *see Mendoza,* 195 F.3d at 1242, the statements and conduct must be of a sexual or gender-related nature—"sexual advances, requests for sexual favors, [or] conduct of a sexual nature," *id.* at 1245,—before they are considered in determining whether the severe or pervasive requirement is met. Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted. Title VII, as it has been aptly observed, is not a "general civility code." *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2283-84.

### (1) Non-Gender Related and Non-Sexual Statements and Conduct

Gupta complains of several things that no reasonable person would consider to be of a gender-related or sexual nature. For example, she complains that Rhodd told her to steer clear of certain faculty members because they were evil and racist. Those statements merit no mention in a discussion of sexual harassment, except perhaps to serve as a clear example of what it is not.

Gupta also complains that Rhodd assisted her with the move to Fort Lauderdale by helping her find a place to live and to find inexpensive furniture. She also criticizes him for telling her to come and see him if there was anything he could do for her. Mere solicitude, even if repetitive, is not sexually harassing behavior.

12

Another matter Gupta complains about that is either not sexual in nature, or insufficiently so to be due any real weight, is that Rhodd suggested he, Gupta, and Neela Manage go to lunch at a Hooters restaurant a few hours after she arrived for her interview with the University. Gupta may have been offended by that suggestion, and apparently was, but we do not think that a reasonable person would have thought that such an invitation, unaccompanied by any sexual remark and not pressed when it was declined, was necessarily based on the sex of the invitees or was a sexual comment or suggestion of any kind. The same is true of Rhodd and Sarah Ransdell taking Gupta to dinner at Mango's, and of both of them and Ransdell's boyfriend taking Gupta to dinner at Shooter's, places which Gupta described as bars. Inviting a member of the opposite sex to be part of a group going to dinner at a bar is not evidence of sexual harassment. *See Mendoza,* 195 F.3d at 1254 (Edmondson, J., concurring) ("The conduct of which plaintiff complains is neither obviously sexual in nature nor even sex-specific.")

(2) Statements and Conduct of a Gender-Related Or Sexual Nature or Arguably So

If the complained of statements and conduct are of a gender-related or sexual nature, there are four factors that we consider in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms or conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza,* 195 F.3d at 1246. We will now consider comments and behavior of Rhodd that are, or arguably could be, considered to be of a sexual or gender-related nature. We doubt some of it is, but for present purposes we will assume it to be.

Gupta complains that on one occasion—one time during six months—Rhodd told her, "You are looking very beautiful." She did not say he made any kind of sexual gesture along with the remark, or even that she perceived he was leering at her when he said it, only that he complimented her looks with those words. It is debatable whether such a compliment is sexual in nature, but assuming that it is, we do not

13

believe that a reasonable person would deem it to be offensive. A man can compliment a woman's looks (or a woman compliment a man's looks) on one or several occasions, by telling her that she is looking "very beautiful," or words to that effect, without fear of being found guilty of sexual harassment for having done so. Words complimenting appearance may merely state the obvious, or they may be hopelessly hyperbolic. Not uncommonly such words show a flirtatious purpose, but flirtation is not sexual harassment. *See Oncale,* 523 U.S. at 81, 118 S.Ct. at 1003 (explaining that intersexual flirtation is part of ordinary socializing in the workplace and should not be mistaken for discriminatory "conditions of employment").

Except for the phone calls to her home, none of Rhodd's conduct can be described as frequent. Gupta testified that Rhodd phoned her often at 9:30 or 10:00 at night, and over the weekends, and sometimes asked her personal questions during these phone calls.[12] While Gupta testified that these phone calls were frequent, she never contended that they were intimidating or threatening. At no point during these phone calls did Rhodd ask Gupta for a date or make sexually explicit remarks or innuendos.[13] Neither the content of Rhodd's remarks nor the number of the phone calls suggests obsessive or stalker-like behavior by Rhodd. While frequently calling an employee at home and making even innocuous inquiries may be annoying or inappropriate behavior, it does not equal severe or pervasive sexual harassment—if it is sexually harassing conduct at all. As for Rhodd's comments about the promiscuity of people from Jamaica as compared to the innocence of people from India, and the opinion he expressed of women, those statements were far from laudatory, but they were also isolated utterances over a period of several months.

---

[12]Rhodd asked Gupta over the phone, "I was wondering how you were doing?" He also asked, "Are you talking to your boyfriend?" and "Have you had dinner?" Once he asked her, "What kind of personal problems did you have?" in relation to why Gupta had to return to India while studying at the University of Florida.

[13]Rhodd asked Gupta in more than one phone conversation, "Are you in bed?" but there is no evidence that this question was asked in a sexual context or had any improper sexual connotation. Given that it is common courtesy when calling late at night to ask if the person answering was in bed or asleep, and given the absence of any follow-up question or remark of a sexual nature, we do not think that a reasonable person would interpret the question as one that is sexually suggestive.

14

Gupta did testify that on one occasion when Rhodd was expecting her to come pick up a book from his office, she entered his office and found him sitting in his chair with no dress shirt on, but wearing an undershirt. When she entered his office, he grabbed his dress shirt, "unbuckled his belt and pulled down his zipper and start[ed] tucking his shirt in." But Gupta acknowledged that the air conditioning was broken on the day in question and that it was "very hot in the building." Gupta did not contend that Rhodd made any inappropriate gestures or comments toward her when he tucked in his shirt. His conduct on this isolated occasion was not "physically threatening or humiliating." *See Minor v. Ivy Tech State College,* 174 F.3d 855, 858 (7th Cir.1999) ("It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses coarse language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee, to be classified as discriminatory.").

Moreover, Gupta cannot establish her hostile environment claim with allegations that Rhodd stared at her twice, touched her ring and bracelet once, and kept asking her to lunch. Assuming it was sexual in nature, none of that conduct was severe, threatening, or humiliating. As the Supreme Court has observed, in a normal office setting interaction between employees is to be expected. *See Faragher,* 524 U.S. at 788, 118 S.Ct. at 2283-84. What one employee might perceive as conduct which crosses the proverbial line, another might perceive as banter. We cannot mandate that "an employer [ ] be required under pain of legal sanctions to ensure that supervisors never look or stare at a subordinate whom they are supervising in such a way that she might think they are 'coming on' to her." *Mendoza,* 195 F.3d at 1256 (Carnes, J., concurring). Nor can we mandate that an employer be required to ensure that supervisors never touch employees on the hand or finger or ask them to lunch.

Of all the conduct about which Gupta complains, the most serious is Rhodd's placing his hand on her knee once, and his touching the hem of her dress once. He should not have done either of those things. But those were only two incidents in a period of six or seven months during which they were interacting (out of an even longer period during which the two worked for the University). Each incident was only

15

momentary, and neither was coupled with any verbal suggestions or advances. *See Minor,* 174 F.3d at 857 (no hostile environment where the supervisor, among other things, on one occasion "put his arms around [the plaintiff], kissed her, squeezed her, and said, 'Now, is this sexual harassment?' ").

The fourth factor in determining whether conduct and statements are "sufficiently severe or pervasive" to create a hostile work environment is whether the conduct and statements unreasonably interfere with the plaintiff's job performance—a factor which involves both a subjective and objective inquiry. *See Mendoza,* 195 F.3d at 1246. Gupta contended at trial that she suffered from depression, nervousness, anxiety, nose bleeds, fatigue, weight gain, and other physical manifestations of stress as a result of Rhodd's behavior and her fear that she would be fired. She testified that those manifestations affected her research and caused her to miss deadlines. She also testified that she stayed away from the University's campus as much as possible to avoid seeing Rhodd. Given the posture of this case, we accept all of that as true, and Gupta has certainly met the subjective prong of the required showing. But a plaintiff's subjective feelings and personal reactions are not the complete measure of whether conduct is of a nature that it interferes with job performance. If it were, the most unreasonably hypersensitive employee would be entitled to more protection than a reasonable employee, and the standard would not have an objective component. The standard does have an objective component, and applying it we conclude that the conduct and statements in question would not have interfered with a reasonable employee's performance of her job.

We are aware of our duty to examine and consider all of the behavior and conduct of a sexually or gender-related nature collectively in determining whether it meets the "sufficiently severe or pervasive" requirement. We have done so, and it does not. The alleged harassment in this case exemplifies "the ordinary tribulations of the workplace," *Faragher,* 524 U.S. at 788, 118 S.Ct. at 2284, which the Supreme Court and this Court have held do not constitute actionable sexual harassment. Gupta failed to present evidence that Rhodd's conduct was in anyway "physically threatening or humiliating," or that a reasonable person would view the conduct as "severe." *Mendoza,* 195 F.3d at 1246. The Fifth Circuit recently opined, "All of the

16

sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." *Indest v. Freeman Decorating, Inc.,* 164 F.3d 258, 264 (5th Cir.1999) (citations omitted). This is not such a case.

Furthermore, a finding that Gupta's complaints constitute sexual harassment would lower the bar of Title VII to punish mere bothersome and uncomfortable conduct, and would "trivialize true instances of sexual harassment." *Mendoza,* 195 F.3d at 1252 n. 10. Based upon *Mendoza,* we hold that there was insufficient evidence presented at trial to support the jury's verdict finding the Board liable for hostile environment sexual harassment under Title VII, and we reverse the judgment of the district court on that claim.

*B. The Retaliation Claim*

Retaliation is a separate violation of Title VII. "To recover for retaliation, the plaintiff 'need not prove the underlying claim of discrimination which led to her protest,' so long as she had a reasonable good faith belief that the discrimination existed." *Meeks v. Computer Assocs. Int'l.,* 15 F.3d 1013, 1021 (11th Cir.1994) (quoting *Tipton v. Canadian Imperial Bank of Commerce,* 872 F.2d 1491, 1494 (11th Cir.1989)). Although the conduct Gupta complained about was not so severe and pervasive that it altered her working conditions, we cannot say that she lacked a "reasonable good faith belief" that she was being sexually harassed. As a result, the jury's verdict finding retaliation may stand independent of our reversal of the sexual harassment verdict if there was sufficient evidence presented at trial to support the retaliation verdict. *See Sullivan v. National R.R. Passenger Corp.,* 170 F.3d 1056, 1058-59 (11th Cir.1999). As with the verdict on the sexual harassment claim, we view all of the evidence in the light most favorable to the plaintiff, and do not re-weigh the credibility of the witnesses. *See id.* at 1059.

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must prove the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse

17

employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse employment decision. *See Farley v. Nationwide Mut. Ins.,* 197 F.3d 1322, 1336 (11th Cir.1999). We consider the evidence presented in support of Gupta's prima facie case only in evaluating whether a reasonable jury could disbelieve the Board's proffered nondiscriminatory reasons for its actions. *See Combs v. Plantation Patterns,* 106 F.3d 1519, 1539 n. 11 ("When the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff, the question of whether the plaintiff properly made out a prima facie case is no longer relevant."). We will not revisit the existence of a prima facie case. *See id.*

It is undisputed that Gupta participated in a protected activity. As the district court correctly instructed the jury, Gupta "participated in an activity protected by Title VII by complaining about sexual harassment and filing a sexual harassment charge with the United States Equal Employment Opportunity Commission."

Gupta alleges that she suffered numerous adverse employment actions. An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3rd Cir.1997) (citation and internal marks omitted). Conduct that falls short of an ultimate employment decision must meet "some threshold level of substantiality ... to be cognizable under the anti-retaliation clause." *Wideman v. Wal-Mart Stores, Inc.,* 141 F.3d 1453, 1456 (11th Cir.1998). In evaluating what actions meet that required level of substantiality, we recognize that "Title VII[ ] is neither a 'general civility code' nor a statute making actionable the 'ordinary tribulations of the workplace.' " *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1178 (10th Cir.1999) (citation omitted). Whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim must be determined on a case-by-case basis, *id.* at 1178, using both a subjective and an objective standard, *see Doe v. Dekalb*

18

*County School Dist.,* 145 F.3d 1441, 1448-49 (11th Cir.1998) (recognizing that the subjective requirement is virtually almost always satisfied and imposing an objective requirement, as well).

Gupta presented testimony that she was subject to the following actions, which she contends are adverse employment actions: (1) she was not given a pay raise despite an above satisfactory evaluation by her supervisor; (2) she was denied an extension on her tenure clock;[14] (3) she was placed on the search committee for a position at the University's Boca Raton campus, which prevented her from applying for that position; (4) she was assigned to teach more credit hours than other professors and to teach classes on three different campuses in the Fall 1997 session; (5) she was not assigned to teach a desired class in the Summer 1995 second session; (6) Dean White's office intentionally delayed her visa application to the Immigration and Naturalization Service; and (7) the informal resolution process involving her sexual harassment claim was terminated without notice after she missed one deadline.[15]

The last five listed actions that Gupta complains of are not "adverse employment actions."[16] None of those actions were "objectively serious and tangible enough" to alter Gupta's "compensation, terms, conditions, or privileges of employment, deprive ... her of employment opportunities or adversely affects ... her status as an employee." *Robinson,* 120 F.3d at 1300 (internal marks omitted). First we consider Gupta's placement on the search committee to fill a position at the University's Boca Raton campus, which prevented her from applying for that position. Although Gupta had indicated some interest in the position at the time she was asked to serve on the search committee, she had not yet applied for the position. Once asked to serve on the committee, Gupta accepted the offer to serve and at no time asked to be removed from the committee.

---

[14]"Tenure clock" refers to the six-year period in which an untenured professor has to obtain tenure.

[15]We dispose here of Gupta's complaint about Stronge telling her that he was going "to have to write [her] a letter saying that [she was] not making sufficient progress towards tenure." A threatened letter never actually written cannot constitute an adverse employment action.

[16]We reach this conclusion after considering all of her allegations individually and collectively. *See Wideman,* 141 F.3d at 1456 (considering plaintiff's allegations collectively and holding that plaintiff established adverse employment action).

Serving on a search committee is something most people would consider an honor and Gupta's doing so without objection cannot be considered an adverse employment action.

Nor do Gupta's teaching assignments constitute adverse employment actions. Stronge testified that scheduling Gupta to three different campuses was a mistake, and once he became aware of it, he promptly corrected the mistake. He then revised Gupta's schedule so that she was teaching only two classes on two different campuses. She never taught on more than two campuses in any term.[17] A proposed action that is corrected as soon as the proper official is made aware of it and before it goes into effect, so that the employee does not actually suffer any consequence, is not "adverse."

A university can assign its professors to teach the classes it needs them to teach. Although Gupta complains that she was not assigned a particular class in the second session of Summer 1995, she presented no evidence at all that she was in any way entitled to or particularly deserving of that class, as opposed to the classes she was assigned to teach, or that other untenured professors routinely got to cherry-pick the classes they taught. Besides, Gupta later chose not to teach at all that summer, because she "was not feeling good." Instead of teaching, she took a trip to Hawaii with a friend. An action which, it turns out, had no effect on an employee is not an "adverse" action. Under the facts and circumstances of this case, Gupta's teaching assignments do not constitute actionable adverse employment actions.[18]

---

[17]Stronge testified that Gupta was not the only professor who was teaching two classes on two different campuses. She apparently would have been the only professor teaching on three different campuses if that mistake had not been corrected.

[18]Gupta also complains that Stronge refused to let her develop a proposal for a new class entitled "Women in the Global Economy." A university can choose to offer whatever courses it wants to offer and has no duty to accommodate its professors' desire to create new classes. Furthermore, Stronge testified without contradiction that when Gupta asked him whether it was a good idea to teach the proposed class, he responded "that [it] would not [be] a good thing for her to do at this stage of her career, because at this stage of her career, she does not have tenure and she would be moving away from her field of specialization in order to develop this new course...." There was no evidence that Stronge encouraged or allowed other professors in the economics department to develop and teach new courses away from their field of specialization.

The delay by White's office in completing and returning Gupta's visa application to the Immigration and Naturalization Service was not an adverse employment action. Although the visa application was not completed promptly, it was returned to Gupta in sufficient time for her to file the application with the Immigration and Naturalization Service, which she did. Gupta was in no way harmed by the delay. It follows that the action, or inaction, was not "adverse."

Finally, the University's termination of the informal resolution process involving Gupta's sexual harassment claim, without first warning her that if she missed the deadline they would close the case, was not an adverse employment action. Gupta chose to use the University's informal resolution process, and on March 30, 1995, she was given a proposed settlement agreement prepared by the University's attorney. She took the settlement agreement home, but later choose not to sign it because she did not want "to give up [her] rights." Notwithstanding that decision, around April 6, 1995, Gupta asked Paula Behul, the Director of Equal Opportunity Programs, for more time to respond to the proposed agreement. Behul gave her sixty additional days in which to respond. Gupta, however, failed to respond during the additional sixty-day period. In June of 1995, Gupta stopped by Behul's office and said that she had been very busy and would get back with her some time in the future. In September of 1995, after having not heard from Gupta for almost three months following the sixty-day extension, Behul scheduled a meeting with Gupta in an attempt to resolve the issue. At that meeting, the two of them agreed that Gupta would give Behul a counter-proposal to the proposed agreement no later than October 9, 1995. Gupta did not return the counter-proposal by that deadline.[19] On October 12, 1995, Behul sent Gupta a letter stating that the informal resolution process was terminated. That

---

[19]On October 9, 1995, Gupta called Behul and stated that she was really busy and would be unable to get the counter-proposal to her that day, but would probably be able to bring the counter-proposal to Behul by October 10 or 11. Gupta sent Behul a letter and counter-proposal in the mail sometime prior to October 11, but Behul never received the letter.

21

termination occurred after six months of attempting to get Gupta to respond to the University's settlement proposal.[20]

To begin with, an employer is not legally required to attempt to settle an employee's Title VII claim at all. Any action or inaction in regard to settlement of a claim cannot be retaliation for making the claim in any meaningful sense, because every action or inaction in regard to settlement of the claim is caused by the claim. The anti-retaliation provisions of the various job discrimination statutes are aimed at preventing the employer from punishing the employee by making job conditions worse. The failure to settle a claim for whatever reason does not make job conditions worse as a result of the claim having been made. They are already "worse" (if the underlying claim is valid). The failure to settle is not something that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Robinson,* 120 F.3d at 1300 (internal marks omitted). The settlement of a claim, in short, is not a condition of employment.[21]

Having explained why five of the seven actions about which Gupta complains were not adverse employment actions, we turn now to the remaining two—not being given a pay raise despite an above satisfactory evaluation and the denial of an extension on her tenure clock. The denial of a pay raise clearly affects Gupta's compensation, and tenure-related decisions affect an important term of employment for a university professor. They are adverse employment actions.

---

[20]Gupta testified that White remarked, "Why don't you drop the case and get on with your life," when she asked him to reopen her case and resume the informal resolution process. Even assuming that statement could constitute circumstantial evidence of retaliation, it does not in this case because White was not a decision-maker in closing her case or in either of the two actions that we hold constitute adverse employment actions. Although his office was responsible for the delay in completing Gutpa's visa application, as we have already stated, that delay was not an adverse employment action.

[21]Even if it were possible to have a viable retaliation claim on bad faith in settlement negotiations, Gupta has utterly failed to present an evidentiary basis for a finding that the University failed to act in good faith in regard to settling her claim. Gupta was given abundant opportunity to respond to the University's proposal, and negotiations broke down because of her indecisiveness. No reasonable fact finder could find that the University's decision to end the process was based upon anything except Gupta's failure to respond or that its decision was unreasonable under the circumstances.

Accordingly, we proceed to determine whether there is a causal connection between Gupta's participation in a protected activity and an adverse employment action. To establish a causal connection, a plaintiff must show that "the decision-maker[s] [were] aware of the protected conduct," and "that the protected activity and the adverse action were not wholly unrelated." *Farley,* 197 F.3d at 1337 (citations, internal marks, and emphasis omitted). For purposes of a prima facie case, "close temporal proximity" may be sufficient to show that the protected activity and the adverse action were not "wholly unrelated." *Id.*

Gupta presented sufficient evidence at trial that the decision-makers were aware that she had filed a complaint against the University. Stronge announced at a faculty meeting in 1996 that Gupta had filed a complaint against the University.[22] Moreover, the two adverse employment actions arguably occurred within close temporal proximity to the respective decision-makers learning of Gupta's protected activities. Although Gupta did not file a complaint with the EEOC until the spring of 1996 and did not file suit until June 25, 1996, she complained about the alleged sexual harassment to other faculty members in late 1994 and to Dean White in January 1995. Gupta was denied a merit raise in the spring of 1996 and was denied a tenure extension in early 1997.

As it was entitled to do, however, the Board proffered nondiscriminatory reasons for its employment actions. *See Sullivan,* 170 F.3d at 1059 ("Once the plaintiff makes out a prima facie case, the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action." (citation and internal marks omitted)). With respect to the first retaliatory act alleged by Gupta, not being given a merit raise, the University established without evidentiary dispute that its decision not to award Gupta a pay raise was based on appropriate and reasonable criteria.

---

[22]The Board never denied that those in decision-making positions regarding the two adverse employment actions knew about Gupta's pending lawsuit. Moreover, several professors acknowledged that they were sensitive to Gupta's lawsuit. For example, Stronge testified in his deposition, "I said I wanted to be sure that I responded properly to her request for the tenure clock extension, and that one reason for that was that she currently had a lawsuit against the university, and I did not wish to influence that lawsuit one way or the other."

In the spring of 1996, Stronge ranked eight economics professors and placed them into three groups—high, medium, and low. Stronge divided the professors into those groups by reviewing 1995 year-end evaluations made by each professor's supervisor and by making an independent evaluation of each professor. In the course of assessing the evaluations by the supervisors, Stronge reviewed the information upon which they were based, including student evaluations, publications and research accomplished, grants received, service on committees, and service to the University. Stronge's ranking was then reviewed and merit raises were awarded to the professors based on the group in which each professor was placed, *i.e.,* the highest group received the highest merit raise.

Gupta's initial evaluation, performed by Mona Domash, who was Gupta's immediate supervisor during 1995, was above satisfactory.[23] However, when Stronge reviewed Domash's evaluation, he disagreed with her findings. He believed Gupta's teaching was "generally below the average" based on a review of student evaluations and "her research was generally below what I would expect to see." Stronge found it particularly relevant that Gupta had not published anything at all during the year in question.[24] He also testified that he believed Domash's evaluation was influenced by a letter from Gupta apologizing for accomplishing so little that particular year due to a medical illness. Gupta's letter was attached to Domash's evaluation.

Gupta produced no evidence upon which a reasonable fact finder could conclude that Stronge's explanation for not awarding her a merit pay raise was pretextual. She does not dispute that she had failed to publish anything. Moreover, in her letter to Domash she acknowledged she had accomplished little. Nor did Gupta present any evidence that her 1995 student evaluations justified a higher ranking than she received.

---

[23]Domash's evaluation stated that Gupta has shown "considerable improvement in teaching relatively large rigorous courses." She also commented that: "Doctor Gupta has worked hard on two research articles. In 1996, she resubmitted an article to the Rand Journal of Economics, a top-ranked journal. She has also submitted another major article for publication. This is the start of a very promising research career."

[24]Gupta did not have her first article published until two years later, and a few weeks before this trial began in July of 1997.

Finally, Gupta produced no evidence at all that any professor whom Stronge ranked higher than her for merit pay purposes had not performed better than she. Gupta failed to create a genuine issue of material fact that the Board's nondiscriminatory reasons for not giving her a merit pay raise were pretextual.

With respect to the second adverse employment action, the denial of an extension on Gupta's tenure clock, the University established without evidentiary dispute that an extension was not justified and, moreover, her request for one was premature. In December of 1996, Gupta wrote a letter to Dr. Osborn, the Provost of the University, requesting an additional year on her tenure clock and stating as the sole reason that the criteria used to evaluate her for tenure and promotion had changed when she was transferred from the College of Liberal Arts to the College of Business.[25] Osborn received her request and, in response, he asked Gupta to explain specifically what those changes were. He also suggested that she meet with her current and former deans for guidance. Gupta sent a second letter, but she neither explained the changes further nor indicated that she had consulted with either dean.[26]

Notwithstanding Gupta's failure to follow Osborn's instructions as to the form of the request, he considered her request for an extension of the tenure clock on its merits. As was the procedure in such matters, Osborn reviewed the recommendations of three other professors who had opined that Gupta should be denied a tenure extension.[27] He independently analyzed the guidelines and procedures for the Colleges

---

[25]Gupta had first written to Osborn in April 1996, requesting an additional year beyond the normal six-year period in which to obtain tenure. That April 1996 request stated: "Between the months of January 1995 and January 1996, I experienced severe medical problems."

Osborn sent Gupta's letter to then-Associate Provost, Marilyn Federico. Federico responded to Gupta and advised her of the proper procedures to request a tenure clock extension. Gupta presented no evidence that she pursued this particular request any further. The action she contends was retaliatory is the denial of her later request for a tenure clock extension, one in which she did not cite medical reasons as a ground.

[26]In Gupta's second letter, she merely enclosed a copy of the guidelines and procedure documents for tenure in the two colleges.

[27]Osborn made the final decision to deny Gupta's tenure clock extension request, but three other professors—Stronge, Dr. Mallen, Dean of the College of Business, and Dr. McBride, vice-president for the

of Liberal Arts and Business and found no significant differences between the tenure criteria of the two colleges. Moreover, Osborn stated that he considered Gupta's request for a tenure clock extension to be premature. Although tenure candidates may wait until their fifth year of continuous employment to request an extension, Gupta applied for the extension in her third year of employment. Consequently, Osborn denied her request.

Gupta presented the testimony of Dr. Appleton, who opined that "significant differences" did exist between the tenure criteria for the College of Liberal Arts and the College of Business. However, Dr. Appleton's conclusory opinion did not delineate any differences in the core requirements of tenure—teaching, research, and service. Gupta also showed that two other professors, Sylvia Laursen and Emily Stockard, previously had been granted tenure extensions. However, the circumstances of those extensions were significantly different from Gupta's request. Laursen was granted a tenure extension after suffering a disabling injury in an automobile accident, while Stockard was granted an extension after her child died immediately after birth. Gupta's 1997 request, on the other hand, stated as its only ground that the criteria for evaluation had changed, not that any medical problem she had would warrant an extension. She presented no evidence at all that anyone else had been granted an extension on their tenure clock as early as the third year of employment. The evidence Gupta presented is insufficient to create a genuine issue of material fact that the Board's nondiscriminatory reasons for declining to extend her tenure clock were pretextual.

After a thorough review of the record, we hold that Gupta failed to present sufficient evidence at trial to support the jury's verdict of retaliation. Although Gupta satisfied the elements of a retaliation claim, the Board presented nondiscriminatory reasons for its actions. The meager evidence, or lack of it, produced by Gupta in response did not permit the jury to "legitimately draw the inference" that the Board's proffered nondiscriminatory reasons for its employment decisions were pretextual and that the real reasons behind their actions were retaliatory. *Sullivan,* 170 F.3d at 1061. No reasonable juror could have found that the Board

---

Broward campuses—reviewed Gupta's request and recommended that the request be denied.

26

retaliated against Gupta because she filed a complaint of sexual harassment. Accordingly, we reverse the judgment of the district court on that claim.

### III. CONCLUSION

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND the case for entry of judgment in favor of the Florida Board of Regents.

RONEY, Senior Circuit Judge, concurring:

I concur in the judgment.

I agree that there was insufficient evidence to go to the jury on the retaliation claim, and that the hostile environment sex discrimination claim could not survive the analysis prescribed by this circuit's decision in *Mendoza v. Borden,* 195 F.3d 1238 (11th Cir.1999)(en banc).