**Ronald SHIELDS, et al., Plaintiffs,**

v.

**FORT JAMES CORPORATION, Defendant.**

**No. Civ.A. 99–1045–S.**

United States District Court, S.D. Alabama, Southern Division.

April 9, 2001.

---

Richard A. Meelheim, Meelheim, Wilkinson & Meelheim, Birmingham, AL, for Plaintiff.

Tracy P. Turner, Johnstone, Adams, Bailey, Gordon & Harris, Mobile, AL, Chris Mitchell, Constagny, Brooks & Smith, Birmingham, AL, W. Carter Younger, James L. Banks, Jr., McGuire, Woods, LLP, Richmond, VA, for Fort James Corp.

## ORDER

STEELE, United States Magistrate Judge.

This cause is before the Court on Defendant Fort James Corporation's Motion for Summary Judgment (Doc. 31), and Fort James Corporation's Memorandum in Support of Motion for Summary Judgment (Doc. 32); Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 34); Defendant's Reply Memorandum in Support of Motion for Summary Judgment (Doc. 35); and Plaintiffs' Supplement to Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 41). Upon consideration of all matters presented, and for the reasons set forth herein, Defendant Fort James Corporation's Motion for Summary Judgment is GRANTED.

## DISCUSSION

Plaintiffs Ronald Shields, Donald Shields, and John Edwards (hereinafter collectively "Plaintiffs") filed this action against Defendant Fort James Corporation (hereinafter "Defendant") alleging discrimination in the conditions of their employment in violation of the Civil Rights Act of 1991, 42 U.S.C. § 1981(a). Plaintiffs have brought a claim against Defendant alleging that they were subjected to unwelcome racial harassment and subjected to a hostile work environment while working in the maintenance department at Defendant's Naheola Mill in Pennington,

Alabama. Defendant denies the allegations against it and has filed a motion for summary judgment asking the Court to enter judgment as a matter of law in its favor because, Defendant contends, there is no genuine issue as to any material fact with regard to Plaintiffs' claim.

### A. 42 U.S.C. § 1981 Statute of Limitations

Defendant argues that the bulk of Plaintiffs' allegations involve conduct that occurred outside of § 1981's two-year statute of limitations and that these alleged violations are therefore time-barred by the statute of limitations and should not be considered by the Court. Plaintiffs have not responded to this argument by Defendant.[1]

 The statute of limitations for claims brought pursuant to 42 U.S.C. § 1981 is equal to the state statute of limitations for personal injury claims. *Baker v. Gulf & Western Industries, Inc.,*

850 F.2d 1480, 1482 (11th Cir.1988) (*citing Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)). In Alabama, the statute of limitations for personal injury claims is two years. *See Ala. Code* § 6–2–38 (1975). Thus, a § 1981 plaintiff is required to file his complaint within two years of the last alleged discriminatory act. *See Malone v. K–Mart Corp.,* 51 F.Supp.2d 1287, 1304 n. 7 (M.D.Ala.1999). In this case, Plaintiffs' complaint was filed on August 18, 1999. Accordingly, the Court finds that Plaintiffs' § 1981 hostile environment claim is time-barred as to any alleged discriminatory conduct which occurred more than two years before the filing of the complaint, that is, any conduct that occurred before August 18, 1997.[2]

### B. Findings of Facts [3]

#### 1. Plaintiff Ronald Shields

Ronald Shields has been employed by Defendant, or its predecessors, since 1984.

---

1. The Court notes that Plaintiffs were given ample opportunity to respond to Defendant's argument regarding § 1981's statute of limitations. As stated above, Plaintiffs did not respond to the statute of limitations argument by Defendant in their opposition memorandum (Doc. 34). Defendant then filed a reply brief (Doc. 35). In its reply brief, Defendant pointed out that Plaintiffs failed to respond to Defendant's argument regarding the statute of limitations and failed to provide, in their opposition memorandum, the dates on which a majority of the incidents allegedly occurred. Thereafter, Plaintiffs filed a supplemental opposition memorandum (Doc. 41). However, Plaintiffs once again failed to address Defendant's argument regarding § 1981's statute of limitations and also failed to provide any more detail regarding the dates of the alleged incidents of racial harassment.

2. Courts in the Eleventh Circuit have applied the continuing violation doctrine to § 1981 claims. *See Malone,* 51 F.Supp.2d at 1304 (*citing Gonzalez v. Firestone Tire Rubber Co. .,* 610 F.2d 241, 250 (5th Cir, 1980); *Lane v. Ogden Entertainment, Inc.,* 13 F.Supp.2d

1261, 1270 (M.D.Ala.1998); *Patterson v. Augat Wiring Sys., Inc.,* 944 F.Supp. 1509, 1518 (M.D.Ala.1996); *Beasley v. Alabama State University,* 966 F.Supp. 1117, 1129 (M.D.Ala. 1997)). In this case, however, Plaintiffs have failed to respond to Defendant's statute of limitations argument in any manner and therefore have not raised the continuing violation doctrine as an exception to § 1981's statute of limitations. Plaintiffs have made no argument that the conduct which took place prior to the two-year time bar is part of a continuing violation or a continuous pattern or practice of discrimination. As such, the Court will not address the various factors involved in the continuing violation analysis.

3. Unfortunately, the Court's consideration of this case has been hampered by Plaintiffs' opposition memorandum. Plaintiffs completely ignore the dates and, in most instances, even the year in which the alleged incidents of racial harassment allegedly occurred. *See* Plaintiffs' Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 34), pp. 2–14. In their proposed statement of relevant facts, Plaintiffs fail to pro-

In August 1991, Ronald Shields entered into the maintenance apprenticeship and, after four years, became a journeyman mechanic.

Bern Duke, a co-employee, used the word "nigger," told racial jokes, and made derogatory statements about black females regularly from 1991 until he retired in 1998.[4] Ronald Shields complained to Duke and to one supervisor and nothing was done about it.[5] On one occasion, Ronald Shields almost came to blows with Duke when Duke talked about "the way they used to do blacks, especially kids."

On one occasion in 1998, Ronald Shields' supervisor Robert Taylor threatened to fire Ronald Shields and was told that he

---

vide the Court with, excepting a few instances, any specificity regarding the dates on which or the year during which the alleged incidents of racial harassment, which purportedly created and contributed to a hostile work environment, took place. *Id.* This puts the Court in the precarious position of attempting to determine exactly which alleged incidents occurred prior to August 18, 1997, without any information to actually make such determinations. Furthermore, Plaintiffs' proposed facts, which consume more than half of their memorandum, are replete with the use of the terms "racial statements," "racial jokes" and "racial slurs." *Id.* However, a majority of Plaintiffs' proposed facts use only these vague assertions and do not detail in any way the actual content of the alleged racially harassing comments. *Id.* Without more detail, the Court has no way of discerning whether an alleged comment, joke or slur was indeed based on race or whether the alleged comment, joke or slur was merely offensive or whether it actually contributed to a sufficiently severe or pervasive hostile environment. In addition, Plaintiffs repeatedly refer to incidents involving "co-workers," "co-employees," "supervisors," and "union officials." *Id.* In many of the proposed facts, Plaintiffs use only these vague terms and never provide the actual name of the person allegedly involved.

For example, Ronald Shields testified that he has heard racial slurs used at Defendant's mill at least four or five times per day, every day, since the early 1990s up to the week before his deposition, which was taken on October 13, 2000. Donald Shields testified that he has been subjected to racial slurs and other discriminatory conduct from 1993 to present. Edwards testified that he heard racial slurs used at Defendant's mill three to four times per week, four to five times per day, up until the time the instant lawsuit was filed. However, these allegations are supported by no other information; Plaintiffs have not identified the person or persons who made these slurs, the person to whom the slurs were made, or the context or content of the slur. As stated above, the Court is unable to discern whether the alleged racial slurs were indeed slurs that were based on race, whether the slurs were merely offensive epithets, or whether the slurs were part of a sufficiently severe or pervasive hostile environment.

Accordingly, the Court refuses to comb through deposition testimony in order to determine if a specific date or year accompanies Plaintiffs' vague allegations. The Court also refuses to comb through deposition testimony to determine if any details accompany Plaintiffs' vague and conclusory allegations of "racial" comments by "co-employees," "supervisors," and "union officials ." As such, while the evidence and all factual inferences arising from it must be viewed in the light most favorable to Plaintiff, the non-moving party, *Tipton v. Bergrohr GMBH–Siegen,* 965 F.2d 994, 998–999 (11th Cir.1992), *cert. denied,* 507 U.S. 911, 113 S.Ct. 1259, 122 L.Ed.2d 657 (1993), the Court has considered only those proposed facts by Plaintiffs that contain at least some specificity as to date or content (within the bounds of the statute of limitations) in making its findings of fact. The Court has also considered Defendant's proposed facts in making its determinations of fact.

4. While any comments made before August 18, 1997 would be time-barred, some of Duke's comments were made after that date.

5. According to Defendant's reply brief, RonaldShields testified that he complained to his supervisor Jimmy Roberts on one occasion about Duke's conduct, Roberts talked to Duke, and RonaldShields never again reported any racial comments by Duke to any su-

did not like having to work with certain people at the company.[6] Ronald Shields filed a grievance about the incident which was arbitrated. Ronald Shields won the arbitration but nothing was ever done to Taylor except to promote him.[7]

Ronald Shields has had significant emotional distress as a consequence of Defendant's alleged discrimination against him and has been prescribed medication by his personal physician. Ronald Shields has lost pay because he does not work overtime if Robert Taylor or David Bailey is working.

### 2. Plaintiff Donald Shields

Donald Shields has been employed by Defendant, or its predecessors, since 1981. In 1993, Donald Shields began a four-year apprenticeship program.

On one occasion after 1997, Donald Shields was sitting at a work table with "Horse" Doggett (who was his shop steward), Marvin Waltman, Stanley Norwood,

John Bonner and Robert Harry (who was his supervisor), when Bonner began to talk about "nigger titties." Others, including Doggett, talked about "nigger toes" and used other slurs. Donald Shields had previously repeatedly advised everyone that the use of racial slurs and, specifically, the use of the "n" word, was offensive to him. On this occasion, neither Harry, his supervisor, nor Doggett, his shop steward, intervened on his behalf, and Donald Shields' only option was to leave in disgust. Donald Shields later complained to his supervisor, Harry, whose response was that "he did not know what to do about it." Donald Shields also complained to his shop steward, Eldridge,[8] who responded by telling him that "if they stopped that type of BS in the plant, then they will have to stop all BS in the shop." To Donald Shields' knowledge, no one was ever disciplined for this incident, but Donald Shields was isolated by the white employees as a consequence.[9]

---

pervisor. Defendant's Reply Brief (Doc. 35), page 9.

**6.** Plaintiffs offer this testimony by RonaldShields concerning this allegation:

... [a]nd Robert stated there was certain people at this mill he did not like that he had to work with anyway ... And I asked him was I one of those folks? And he would not answer ... I said, Robert, I need to find out what's wrong with you, what you got against me. And Robert said again, he said, well, there are certain people at the company that, you know, he don't like that he had to work with anyway. Then I said, well, Robert, who are those people? Then he looked at me and he said, well—he brought up about race and after I—no, whoa. I don't want to go there. Not yet ... He brought up, he said, well, what race or ethnics—I said, no, I don't want to go there.

**7.** According to Defendant's reply brief, RonaldShields and Taylor had an argument after which Taylor said that there are some people that he does not like working with but that he works with them anyway. The matter was

investigated and it was determined that, while race was not involved, Taylor should have been more sensitive in his handling of the situation. Taylor's scheduled pay raise was suspended for six months and he was sent to a week-long training session to enhance his interpersonal skills. An arbitrator later found that, while RonaldShields believed he had been discriminated against, there was no evidence that race was a factor. Defendant's Reply Brief (Doc. 35), page 9.

**8.** Plaintiffs do not provide a first name for this individual.

**9.** According to Defendant's reply brief, John Bonner and Marvin Waltman used the terms "nigger titties" and "nigger toes" in describing a trip to Hershey, Pennsylvania. Donald Shields complained to his supervisor Robert Harry about the incident and Harry reported the matter to Human Resources. Defendant met with Donald Shields and others about the incident, and both Bonner and Waltman were formally disciplined. Donald Shields testified that he has not heard Bonner or Waltman make any racial comments since this incident.

On another occasion after 1997, Donald Shields requested his supervisor Harry to order a "bunch of tools," and when they came in, Harry gave the new tools to white employees and gave Donald Shields Harry's old tools.[10] When this happened, Donald Shields "jumped up because he had had enough," but was restrained by English Office, another black employee.

After 1997, white co-employee Bonner made derogatory comments about young blacks and Doggett made comments about blacks "spitting watermelon seeds." [11]

Sometime in or after 1997, a white "set-up" foreman, Stanley Norwood, assigned all overtime to white employees.[12]

A white co-employee, Pete Bledsoe, continually tells racial jokes and told a racial joke as recently as two weeks before Donald Shields' deposition, which was taken on October 12, 2000.[13]

According to Donald Shields, the use of racial slurs still occurs at Defendant's mill but the use of "n" word has gone down. In 1998, the use of racial slurs, including the "n" word, reached "epidemic proportions."

Donald Shields has "internal scars" as a consequence of Defendant's racism and discriminatory conduct. He has been tense, aggravated, upset and angry to the point where he has just wanted to "leave the job," but if he did, he would "lose all the way around ." He has been prescribed medication, including sleeping pills, to help him cope.

### 3. Plaintiff John Edwards

Edwards is a forty-five year old black male who has been employed by Defendant, or its predecessors, since 1978. Edwards began working in the maintenance department in 1993. He was in the apprentice program during the first four years that he was in maintenance. In 1997, Edwards graduated from the apprentice program and became a journeyman mechanic.

Between 1993 and 1998,[14] co-worker Bern Duke commonly referred to blacks as "niggers," and despite Edwards objection and/or complaint to Duke, Duke continued to do so until his retirement in 1998.[15]

Larry Shields, a white union president who is not related to Plaintiffs, investigated an incident where David Bailey, maintenance director, "erupted on John Edwards." He and "everybody" else thought that it was inappropriate and that it was because of Edward's race.[16]

Defendant's Reply Brief (Doc. 35), pages 10–11.

10. Donald Shields never reported this incident to any supervisor, union official or the EEOC. Defendant's Reply Brief (Doc. 35), page 10.

11. Donald Shields never reported these incidents to any supervisor, union official or the EEOC. Defendant's Reply Brief (Doc. 35), page 11.

12. Donald Shields testified that Robert Harry put a stop to this practice once he learned of it. Defendant's Reply Brief (Doc. 35), 11.

13. Donald Shields never reported Bledsoe's conduct to a supervisor, union official or the EEOC. Defendant's Reply Brief (Doc. 35), page 10.

14. While any comments made before August 18, 1997, would be time-barred, some of Duke's comments were made after that date.

15. Edwards never reported these comments to a supervisor, union official or the EEOC. Defendant's Reply Brief (Doc. 35), page 8.

16. This is the only information that Plaintiffs' memorandum provides about the "incident" with David Bailey. However, Defendant's reply brief relates that on October 12, 1998, Raymond David Bailey confronted Edwards about the fact that he was in the shift shop break area 45 minutes before the end of his shift when he was assigned to the paper mill. Bailey told Edwards that he was stealing time from the Company by not being where he was supposed to be. Defendant's Reply Brief (Doc. 35), page 7. Additionally, Defendant relates that Edwards was the only employee in

Approximately one year prior to his deposition, which was taken in October 2000,[17] Edwards heard a co-employee Thomas Spears use the term "nigger" in reference to two black employees.[18]

During the week prior to his deposition, co-employee John Morgan made racial slurs or derogatory racial comments within Edwards' hearing.[19]

As a consequence of the alleged discriminatory treatment, Edwards "suffered a lot of mental anguish" and was treated by his personal physician.

*C. Summary Judgment Analysis*

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

Rule 56(c) Fed.R.Civ.P. "A factual dispute is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party. A fact is 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Technologies, Inc.*, 882 F.2d 993, 996 (5th Cir.1989) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *accord, Tipton*, 965 F.2d at 998–99.

The essential issue before the Court on a motion for summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 251–252, 106 S.Ct. 2505. The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the Court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Tipton*, 965 F.2d at 998–99; *Johns v. Jarrard*, 927 F.2d 551, 555 (11th Cir.1991) (*quoting Apcoa, Inc. v. Fidelity Nat'l. Bank*, 906 F.2d 610, 611 (11th Cir. 1990)). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court must deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir.1992) (*citing Mercantile Bank & Trust Co. v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir.1985)).

"Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

---

the shift shop break area who was not assigned to the shift shop and Bailey believed that Edwards was not supposed to be there. Edwards was not disciplined for the incident and Bailey later apologized when he learned Edwards had permission to be there. *Id.*

**17.** Edwards deposition was taken on October 11, 2000.

**18.** According to Defendant, Edwards complained to his supervisor Bob Collins, the matter was investigated, and Spears was formally reprimanded. Edwards never again heard Spears make any racial comments. Defendant's Reply Brief (Doc. 35), page 7.

**19.** According to Defendant's reply brief, Edwards heard John Morgan say something along the lines of "that 'ol black man.'" Edwards never reported the comment to a supervisor, union official or the EEOC. Defendant's Reply Brief (Doc. 35), page 7.

trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986) (*accord Kramer v. Unitas*, 831 F.2d 994, 997 (11th Cir.1987)). The movant's burden is discharged by showing that there is an absence of evidence to support the non-moving party's case. When the movant has met this burden, the non-movant must present evidence establishing a material issue of fact. *Id.*

As stated above, once the movant satisfies the initial burden under Rule 56(c) by demonstrating the absence of a genuine issue of material fact, the burden then shifts to the non-movant to "come forward with *specific* facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (*quoting* Rule 56(c) Fed.R.Civ.P.). Otherwise stated, the non-movant must "demonstrate that there is a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).[20] "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990). The non-moving party may avail itself of all facts and justifiable inferences in the record taken as a whole. *Tipton*, 965 F.2d at 998 (*citing United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 999 (*quoting Anderson*, 477 U.S. at 255, 106 S.Ct. 2505 (*citing Adickes*, 398 U.S. at 158–159, 90 S.Ct. 1598)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## D. Hostile Environment Racial Harassment Claim

In this case, Plaintiffs allege that they were subjected to unwelcome racial harassment and subjected to a hostile work environment while working in the maintenance department at Defendant's Naheola Mill. Defendant contends that Plaintiffs allegations fail to establish a hostile work environment or any basis for holding Defendant liable for the alleged harassment.

To prove a prima facie case of hostile work environment racial harassment, Plaintiffs must each establish that:

> (1) he belongs to a protected group; (2) he has been subjected to unwelcome racial harassment; (3) the harassment was based on his race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Board of Regents*, 212 F.3d 571, 582–83 (11th Cir.2000) (*citing Mendoza v. Borden Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)).[21]

The fourth element, whether the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working

---

**20.** The shifting burden from movant to non-movant at summary judgment described above applies regardless of which party will bear the burden of proof at trial. *Clark*, 929 F.2d at 607.

**21.** Although *Gupta* and *Mendoza* involved Title VII claims of harassment, the Court notes that the elements of a prima facie case are the same for employment claims brought pursuant to § 1981. *See Howard v. BP Oil Co.*, 32 F.3d 520, 524 n. 2 (11th Cir.1994) (*citing Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) *superceded on other grounds by statute*).

environment," is the element that tests the legitimacy of most harassment claims and is therefore regarded as crucial. *See Gupta,* 212 F.3d at 583 (*citing Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S.Ct. 2275, 2283–84, 141 L.Ed.2d 662 (1998)). The " 'mere utterance of an ... epithet which engenders offensive feelings in an employee' ... does not sufficiently affect the conditions of employment." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (*quoting Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986)). Only when the workplace is "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the [employee's] employment and create an abusive working environment," is the law violated. *Harris,* 510 U.S. at 21, 114 S.Ct. at 370 (*quoting Meritor,* 477 U.S. at 65–67, 106 S.Ct. at 2405).

Accordingly, in order to establish that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment, the employee must make both a subjective and an objective showing. *Mendoza,* 195 F.3d at 1246. The employee must establish not only that he subjectively perceived the environment as hostile and abusive, but also that a reasonable person would perceive the environment to be hostile and abusive. *Gupta,* 212 F.3d at 583 (*citing Mendoza,* 195 F.3d at 1246). The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all of the circumstances. *Mendoza,* 195 F.3d at 1246 (*citing Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998)).

In determining whether the harassment objectively altered an employee's terms and conditions of employment, the following four factors should be considered: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.* (*citing Allen v. Tyson Foods,* 121 F.3d 642, 647 (11th Cir.1997)).

■ With regard to Ronald Shields, it is undisputed that he belongs to a protected group. In addition, in viewing the evidence in a light most favorable to Ronald Shields, it appears that he has been subjected to unwelcome racial harassment which was based on his race. The crucial question before the Court is whether the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment. An examination of the four factors set forth above reveals that Ronald Shields did not endure conduct that was so severe or pervasive that it altered the terms or conditions of his employment.

Ronald Shields' allegation of a racially hostile work environment rests almost exclusively on the alleged comments of one co-employee, Bern Duke. While Duke's use of the term "nigger" was certainly offensive and even severe and humiliating, Plaintiff has presented no evidence that Duke's conduct was physically threatening. Moreover, there is no evidence before the Court that Duke's conduct unreasonably interfered with or impaired Plaintiff's job performance. Whether the alleged conduct unreasonably interferes with an employee's job performance involves both a subjective and an objective inquiry. *Gupta,* 212 F.3d at 586 (finding that, while the conduct in question met the subjective prong of the required showing, the conduct did not meet the objective prong and would not have interfered with a reasonable employee's performance of her job

even where the employee testified that she suffered from depression, nervousness, anxiety, nose bleeds, fatigue, weight gain, and other physical manifestations of stress and that the manifestations affected her research and caused her to miss deadlines). Here, while Ronald Shields alleges that he suffered significant emotional distress and lost pay because he does not work overtime if certain co-employees are working, he has presented no evidence that Duke's alleged racial harassment interferes in any way with the performance of his job.[22]

In addition, the evidence reveals that, on the one occasion that Ronald Shields complained about Duke's conduct to his supervisor Jimmy Roberts, Roberts spoke to Duke about the conduct and Ronald Shields never again complained about Duke.

In order to create a hostile environment, "racial slurs spoken by co-workers have to be so 'commonplace, overt and denigrating that they created an atmosphere charged with racial hostility.'" *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir.1995) (*quoting EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir.1990)). Moreover, as set forth above, only when a workplace is permeated with "discriminatory intimidation, ridicule, and insult," is it sufficiently severe or pervasive to alter the conditions of the employee's employment and create an abusive working environment. *Harris, supra.* In this case, Ronald Shields' allega-

tions clearly fail to establish that he was subjected to a hostile work environment. When Ronald Shields complained about the racially harassing conduct on one occasion, Defendant responded. Accordingly, the Court finds that the conduct at issue was not so objectively offensive and was not so severe or pervasive so as to alter the conditions of Ronald Shields' employment. Even construing the evidence in the light most favorable to Ronald Shields, the Court finds that Ronald Shields' claim falls short of actionable hostile environment racial harassment under the analysis prescribed by the Eleventh Circuit's decisions in *Mendoza* and *Gupta*, set forth above. Therefore, Defendant is entitled to summary judgment in its favor as to Ronald Shields' hostile environment racial harassment claim.

■ With regard to Donald Shields, it is undisputed that he belongs to a protected group. In addition, in viewing the evidence in a light most favorable to Donald Shields, it appears that he has been subjected to unwelcome racial harassment which was based on his race. As stated previously, the critical question before the Court is whether the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment.

Donald Shields' hostile environment claim consists of the isolated comments of co-employees Doggett, Waltman, Bonner and Bledsoe.[23] These isolated racial re-

---

**22.** Regarding RonaldShields' allegation that his supervisor Robert Taylor told him that he did not like having to work with certain people at the company, there is no evidence that Taylor's statement was racially motivated. Even in his statement (see footnote 6) about the incident, R. Shields never actually states that Taylor said he did not like working with him because of his race.

**23.** While Donald Shields' allegations that Harry gave new tools to white employees and gave him old tools and that foreman Norwood assigned all overtime to white employees could, if proven, support a claim for disparate treatment racial discrimination, they cannot help establish that a hostile work environment exists or support a hostile work environment claim. *See Blalock v. Dale County Bd. of Educ.*, 84 F.Supp.2d 1291, 1304 (M.D.Ala.

marks, however, were not sufficiently severe or pervasive to alter the conditions of Donald Shields' employment and create an abusive working environment. After examining the alleged conduct in light of the four factors set forth above, the Court finds that Donald Shields was not subjected to a workplace that was permeated with "discriminatory intimidation, ridicule, and insult." While the isolated racial comments are certainly offensive, severe and even humiliating, they were not frequent, and Donald Shields' has presented no evidence that the conduct was physically threatening. Furthermore, there is no evidence before the Court that the racial remarks unreasonably interfered with or impaired Plaintiff's job performance. While Donald Shields' testimony that he has "internal scars" and that he has been tense, aggravated, upset and angry to the point where he has just wanted to "leave the job" may be evidence that the alleged conduct subjectively interfered with his job performance, there is no evidence that the conduct *objectively* or unreasonably interfered with Donald Shields' *job performance. See Gupta, supra* (emphasis added). In addition, the incident involving Bonner and Waltman, when reported, was promptly investigated by Defendant and both men were disciplined.

In this case, Donald Shields' allegations fail to establish that he was subjected to a hostile work environment. The racial remarks made by Donald Shields' co-employees were not so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *See Edwards,* 49 F.3d at 1521. Accordingly, the Court finds that the conduct at issue was not so objectively offensive and was not so severe or pervasive so as to alter the conditions of Donald Shields' employment. Even construing the evidence in the light most favorable to Donald Shields, the Court finds that Donald Shields' claim falls short of actionable hostile environment racial harassment under Eleventh Circuit case law. *See Mendoza* and *Gupta, supra.* Therefore, Defendant is also entitled to summary judgment in its favor as to Donald Shields' hostile environment racial harassment claim.

■ Plaintiff Edward also belongs to a protected group, and in viewing the evidence in a light most favorable to Edwards, it appears that he has been subjected to unwelcome racial harassment which was based on his race. Again, the crucial question before the Court is whether the harassment was sufficiently severe or pervasive to alter the terms and conditions of his employment and create an abusive working environment.

Edwards claim for hostile work environment basically consists of the isolated comment of two co-employees, Duke and Spears,[24] and the incident involving David Bailey, when he "erupted on John Edwards."[25] The isolated racial remarks and one incident, however, were not sufficiently severe or pervasive to alter the conditions of Edwards' employment and create an abusive working environment. Ed-

---

1999) (*citing Cowan v. Prudential Ins. Co. of Am.,* 141 F.3d 751, 759 (7th Cir.1998)).

**24.** Edwards has also alleged that co-employee John Morgan made a racial slur or derogatory racial comment within Edwards' hearing. However, the Court notes that the comment made was something similar to "that 'ol black man.'" The Court finds that, while perhaps disrespectful, the comment "that 'ol black man'" could hardly be considered a "racial slur." In fact, Edwards admitted that he did not report the comment because he did not think it would be considered a racial slur. *See* Defendant's Reply Brief (Doc. 35), page 7.

**25.** It is questionable whether this incident was in any way based on Edwards' race (see footnote 16).

wards was not subjected to a workplace that was permeated with "discriminatory intimidation, ridicule, and insult," and while the isolated racial comments were offensive and severe, Edwards has presented no evidence that the conduct was physically threatening or that the conduct objectively or unreasonably interfered with or impaired Plaintiff's job performance. Moreover, Edwards never reported Duke's conduct to anyone and, when he did report Spears' one remark, Spears was formally reprimanded.

Here, Edwards allegations' fail to establish that he was subjected to a hostile work environment. The racial remarks made by Edwards' co-employees were not so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *See Edwards, supra.* Accordingly, the Court finds that the conduct at issue was not so severe or pervasive so as to alter the conditions of Edwards' employment. Even construing the evidence in the light most favorable to Edwards, the Court finds that Edwards' claim falls short of actionable hostile environment racial harassment under the analysis prescribed by the Eleventh Circuit. *See Mendoza* and *Gupta, supra.* Thus, Defendant is entitled to summary judgment in its favor as to Edwards' hostile environment racial harassment claim.

## CONCLUSION

Upon consideration of all the matters presented and, for the reasons stated above, the undersigned finds that the conduct shown by Plaintiffs is insufficient as a matter of law to sustain Plaintiffs' hostile environment racial harassment claim. Accordingly, Defendant Fort James Corporation's Motion for Summary Judgment is due to be GRANTED as to all Plaintiffs, and this action is due to be DISMISSED.

The Court will by separate document enter judgment in accordance with this Order.