Charles C. SAUVAGE, Jr., Plaintiff,

v.

John SNOW, etc., Defendant.

No. 8:02 CV 373 T TGW.

United States District Court,
M.D. Florida,
Tampa Division.

Sept. 13, 2005.

Lynn H. Cole, Law Offices of Lynn Cole, P.A., Tampa, FL, Peter Noone, Avery Dooley Post & Avery, LLP, Belmont, MA, Ronald Tonkin, Law Office of Ronald Tonkin, Houston, TX, for Charles C. Sauvage, plaintiff.

Michael Rubinstein, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, Steven A. Nisbet, U.S. Attorney's Office, Middle District of Florida, Tampa, FL, for John W. Snow Secretary of the Department of Treasury, defendant.

## ORDER

WILSON, United States Magistrate Judge.

This is an employment discrimination case in which a retired United States Customs Service special agent alleges that he was the victim of age discrimination and retaliation. The evidence at a non-jury trial fails to establish that the plaintiff was a subject of adverse employment action or that the defendant acted with a discrimina-

tory or retaliatory intent. Consequently, judgment will be entered for the defendant.

### I.

At the beginning of 2000, the plaintiff Charles C. Sauvage, Jr., was an Associate Special Agent–in–Charge of the United States Customs Service's office in Miami, Florida. He had joined Customs in 1987 and, after various assignments and promotions, had reached that position. On March 17, 2000, a letter of directed reassignment was prepared transferring the plaintiff to the Customs' office in Los Angeles as Associate SAIC (Def.Ex. 8). That transfer has given rise to this lawsuit.

The Commissioner of Customs at the time was Raymond W. Kelly.[1] He was a political appointee who, before becoming an Under Secretary of the Treasury, had been Police Commissioner of New York City. He moved from the position of Under Secretary to Commissioner of Customs in the summer of 1998 (I Tischler Dep., pp. 8, 10).

Special agents in the Customs Service were in the Office of Investigations, which was one of twelve divisions in Customs (*see* Def. Ex. 1). At the beginning of 2000, Bonni Tischler was the Assistant Commissioner for the Office of Investigations. However, Tischler was suffering from cancer and at times would be out of the office due to illness or treatment. In her absence, John C. Varrone, who was deputy Assistant Commissioner, would act for her.

Commissioner Kelly was viewed as a micromanager (Eichelberger Dep. of 4/24/03, p. 39; I Tischler Dep., p. 11).

According to Tischler, Kelly thought things were "screwed up at Customs" and he was making a lot of changes (I Tischler Dep., p. 19). Tischler said that Kelly wanted "to make a strong statement of [a] new sheriff in town" and, because there were people who had been sitting in their jobs for a while, he wanted people transferred around (II Tischler Dep., p. 751). Mobility was a condition of employment for the agents (Doc. 110, p. 181; Doc. 112, p. 25; I Tischler Dep., pp. 111–12).

On Monday, March 13, 2000, the Commissioner's office asked Varrone to prepare as soon as possible a list of senior agents for transfer (Doc. 112, p. 41). Varrone promptly discussed that matter with the executive directors of the three domestic Customs regions, and with John Eichelberger, the executive director of Administration, Planning and Policy for the Office of Investigations (*id.* at pp. 14–15, 41–42). Contact was then made with various Special Agents–in–Charge, seeking names for inclusion on a transfer list (*id.* at p. 15). Within a couple of hours, Varrone had received the information and prepared a list of twelve names (Plt.Ex. 1).[2] The list was delivered on March 13, 2000, to the Commissioner's office. The list included the plaintiff's name and indicated that he was to be transferred from Associate SAIC Miami to Associate SAIC Los Angeles (*id.*). Kelly approved the list by initialing it on March 14, 2000.[3]

Varrone testified that he was not surprised to see the plaintiff's name included in the responses to his inquiry (Doc. 112, p. 16). The plaintiff and his supervisor, SAIC Frank Figueroa, did not have a smooth working relationship. Figueroa

---

1. Notably, although Kelly appears to be the ultimate decision-maker with respect to the plaintiff's transfer, his testimony was not presented either in person or by deposition.

2. The twelfth name on the list (Johnny Bonds) was placed there by Eichelberger, apparently as a form of accommodation for a lower level (GS–13) agent (Eichelberger Dep. of 4/24/03, pp. 72–73).

3. The word "hold" is written next to the name of one of the agents on the list.

had previously told Varrone that he thought the plaintiff was undermining him and needed a management change (*id.* at pp. 16–17).

Varrone said he asked John Eichelberger to identify offices in need of an Associate SAIC. Varrone was told that the El Paso and Los Angeles offices had such a need (*id.* at p. 17). Varrone decided to send the plaintiff to Los Angeles based upon the plaintiff's "skills set" because Los Angeles was an under-performing office with a relatively new SAIC (*id.* at pp. 17–18).

On March 17, 2000, the Customs Service issued a letter of directed reassignment to the plaintiff (Def.Ex. 8). Varrone had signed the letter on behalf of Tischler because she was out for chemotherapy treatment that day (*id.;* Doc. 112, p. 21; Tischler MSPB Dep., p. 23). Attached to the letter was a statement of the plaintiff's retirement benefits (Def.Ex. 8). The plaintiff was 53 at the time (Doc. 110, p. 56).

The plaintiff testified that he was shocked when he read the letter (*id.* at p. 81). He subsequently placed the letter in his desk drawer for a week to see if anyone would say anything to him about it. According to the plaintiff, a supervisor normally calls an employee into his office to give the employee his transfer, but that did not happen in his case (*id.* at p. 82).

On April 6, 2000, the plaintiff formally noted his acceptance of the transfer to Los Angeles (Def.Ex. 9). Consequently, the plaintiff received a letter dated April 11, 2000, from the Customs Service regarding the offer of employment in Los Angeles (Plt.Ex. 7). In a related matter, Loraine Brown, the accepting SAIC in Los Angeles, discussed with the plaintiff the plaintiff's reporting date. The plaintiff and Brown agreed that the plaintiff would report to Los Angeles on July 16, 2000 (Doc. 110, p. 90; Doc. 112, p. 104).

On April 28, 2000, the plaintiff signed an employment agreement (Def.Ex. 10). The agreement listed the agreed reporting date of July 16, 2000 (*id.*). Because the transfer was a directed reassignment, the government would pay the plaintiff's expenses arising from the move, including costs related to the sale and purchase of residences. It was expected that the expenses would amount to about $70,000 (Doc. 110, p. 158).

On May 21, 2000, the plaintiff filed a hardship request with the Customs Service's hardship review board, seeking to stay in the Miami area (Plt. Ex. 8; Def. Ex. 14). The plaintiff based his request on his wife's various illnesses and her need to remain in the Miami area due to her cadre of doctors and her family support system, which was located there (*id.*).[4] Eichelberger, by a letter dated June 5, 2000, informed the plaintiff that, under the hardship review board policy, an employee is ineligible to file a hardship request to seek relief from a directed reassignment (Plt.Ex. 11).[5]

On June 7, 2000, the plaintiff filed a complaint with the Treasury Department's

---

4. Mrs. Sauvage has been diagnosed with various ailments, some of which are chronic fatigue syndrome, mixed connective tissue disease, fibromyalgia, Addison's Disease and autoimmune thyroditis (Plt.Ex. 27, p. 11).

5. Also during this period of time, there was some confusion about the plaintiff's reporting date. According to the plaintiff, another Associate SAIC informed the plaintiff that his reporting date was being accelerated by thirty days (Doc. 110, p. 90). The plaintiff then called Cheryl Herbert, an employee relations specialist, about the accelerated reporting date (*id.*). The plaintiff testified that Herbert informed him that she had not received any paperwork and could not tell him why the reporting date was accelerated (*id.* at p. 91). Thereafter, the plaintiff wrote a letter to Tischler complaining that Herbert was accelerat-

office of Equal Employment Opportunity ("E.E.O."), alleging that he was being discriminated and retaliated against on the basis of age, race and sex in connection with his directed reassignment of March 17, 2000 (Plt.Ex. 34). The complaint also stated that he "was being harassed by various Customs Officials in connection with his previous association with Assistant Commissioner Tischler" (id.).

The plaintiff called Tischler about once or twice a week between mid-March and mid-May 2000 concerning his directed reassignment and his desire to stay in the Miami area (II Tischler Dep., p. 474). Tischler informed the plaintiff that she had no input in the formation of the list of transfers and that she and Commissioner Kelly did not get along (Tischler MSPB Dep., p. 26). However, she told him that she would forward to Commissioner Kelly a memo regarding the plaintiff's situation (id; Doc. 110, p. 107), which she did (Tischler MSPB Dep., p. 26). Tischler suggested to the plaintiff that he go to Los Angeles and get a place in Malibu (id. at p. 27). Tischler commented that the Republicans would probably win in the upcoming election and, therefore, Commissioner Kelly would be gone in a year (id.). Thereafter, an attempt could be made to transfer the plaintiff back to Miami (id.). After mid-May 2000, Tischler did not hear from the plaintiff.

In August 2000, the plaintiff filed an E.E.O. complaint against Tischler alleging that she had sexually harassed the plaintiff for a long period of time.[6] Previously, the Internal Affairs office of the Customs Service received an anonymous letter on August 2, 1999, asserting that the plaintiff had received favorable treatment from Tischler because he was a long-time love interest (Plt.Ex. 4). In connection with the Internal Affairs investigation of that allegation, the plaintiff stated under oath on November 8, 2001, that he and Tischler had dated for about a year during 1977–78 (when they were in different agencies) and that, when Tischler, as SAIC in Miami, promoted him in the 1990's, "[t]here was no sexual connotation and/or sexual contact or dating" (id. at Tr. p. 10).

Prior to his reporting date of July 16, 2000, the plaintiff began treatment for extreme stress with pains in his chest, stomach, head and back (Doc. 110, p. 110; Plt. Ex. 27, p. 40; Def. Ex. 23).[7] A clinical psychologist, Dr. Paul S. Foster, diagnosed the plaintiff as having adjustment disorder with mixed emotional features, anxiety, depression and stress (Foster Dep., pp, 7–8; Plt. Ex. 27, p. 40; Def. Ex. 30, p. 2). Dr. Foster recommended that the plaintiff take a two to three month absence from work (Plt.Ex. 27, p. 40).

Consequently, the plaintiff began to submit leave requests. Thus, the plaintiff submitted a sick leave request, which Brown approved, for the dates of July 16, 2000, through October 2, 2000 (Def.Ex. 24).[8] The plaintiff then submitted a sick

---

ing his reporting date (id. at p. 93). On June 15, 2000, Tischler responded that she had no knowledge of Herbert accelerating his reporting date and that under the employee agreement signed by the plaintiff on April 28, 2000, the reporting date was July 16, 2000 (Plt.Ex. 10). However, because July 16, 2000, was a Sunday and the beginning of a pay period, the plaintiff actually was to report to Los Angeles on Monday, July 17, 2000, at 8:30 a.m. (id.).

6. This E.E.O. complaint was not offered in evidence. It was discussed during the trial, and the plaintiff mentions it in his E.E.O. complaint filed on June 25, 2001 (Plt. Ex. 35, pp. 7–8; see also II Tischler Dep., pp. 496–97).

7. Notably, Tischler testified that one of the plaintiff's retired colleagues advised him to "run out your sick leave" (II Tischler Dep., p. 492).

8. Effective July 16, 2000, all leave requests had to be submitted to Brown as she was the

leave request for the remainder of the year from October 3, 2000, through December 29, 2000, asserting that he was "still attending psychologist, internist, and now neurosurgeon for reacurrence [sic] of stress induced former workman's comp [sic] back surgery" (Def.Ex. 25). Brown again approved the leave (*id.*).

Next, the plaintiff submitted an annual leave request for the dates of January 2, 2001, through January 31, 2001 (Def.Ex. 27). Brown in a letter dated January 12, 2001, informed the plaintiff that she had received his latest leave request (Def.Ex. 29). Brown explained that, due to his continuous absence, she was "concerned with the economy and efficiency of operations" and that she needed medical documentation to make a determination on his leave request (*id.*).

Upon receipt of a letter dated January 28, 2001, from Dr. Foster (Def.Ex. 30, p. 2), Brown believed that the plaintiff was fit for duty (Doc. 112, p. 113). The letter stated that "[e]ven though Mr. Sauvage exhibits emotional distress at a moderate level, there is no major psychological problems to suggest that he is unfit for duty" (Def.Ex. 30, p. 2).

Accordingly, on February 2, 2001, Brown wrote a letter to the plaintiff advising him that she approved his leave until February 2, 2001, but that based upon Dr. Foster's letter, he was to report for duty on February 5, 2001 (Plt. Ex. 32; Def. Ex. 31). At 9:19 p.m. on February 2, Dr. Foster faxed a letter to Brown explaining that the plaintiff was still "experiencing significant levels of emotional distress" and, therefore, was "not able to return to work for at least one month" (Def.Ex. 32). On February 5, 2001, Brown informed the plaintiff she needed time to assess his

medical documentation and that she approved his leave request "until further notice" (Def.Ex. 33).

The plaintiff submitted a request for annual leave from March 1, 2001, through March 20, 2001, and for sick leave from March 21, 2001, through May 24, 2001 (Def.Ex. 34). The plaintiff testified that he took family medical leave in order to take care of his wife (Doc. 110, p. 253). Brown approved that request (Def.Ex. 34).

On April 30, 2001, the plaintiff submitted a second application to the hardship review board based on his ailing wife's purported inability to move from the Miami area (Plt.Ex. 27, pp. 50–55). Previously, on January 19, 2001, the Customs Service had amended the hardship review board policy to provide that "employees who receive a directed reassignment will not be considered, except under extreme circumstances" (Def.Ex. 35, p. 3). In his request, the plaintiff asked for a stay of his directed transfer (Plt.Ex. 27, p. 50). The plaintiff's wife's medical records were sent to a Customs Service's medical advisor for review (*see id.* at pp. 68–71).

During this time, the plaintiff did not return to work. According to the plaintiff's letter to Brown of May 23, 2001, the plaintiff was suffering from " 'ulna cuboid decompression' " due to scar tissue in his left elbow, and he was still experiencing chest pains (Def.Ex. 38). Dr. Robert Lenar, an internist, stated that the plaintiff was experiencing chest pain and was "manifesting signs of anxiety" (Def.Ex. 39). Brown approved the plaintiff's request for accrued sick leave through June 27, 2001 (Def.Ex. 37).[9]

In the meantime, Brown, on May 7, 2001, informed the plaintiff that his service

---

plaintiff's supervisor as of that date (Doc. 112, p. 105).

9. Brown signed it noting "[t]hru 6/27 and partial 6/28, using remaining sick leave" (Def.Ex. 37).

gun needed to be returned to the government (Def.Ex. 15). The plaintiff had not qualified with his gun during his sick leave (Doc. 112, pp. 115–117). The Customs Service's handbook states that an employee who is (Def.Ex. 16):

> on authorized sick leave or leave without pay status for more than 30 consecutive days and will therefore be unable to meet the Customs Service qualification requirements must turn in any and all Service-issued firearms to his supervisor prior to the beginning of the approved leave.

Brown testified that, irrespective of the plaintiff's non-qualification status, she should have retrieved the gun the preceding July when she was notified of the plaintiff's stress and anxiety problems (Doc. 112, pp. 116–117, 129). Once she realized her mistake, she told the plaintiff that his gun had to be turned in (*id.*).

On June 7, 2001, Brown notified the plaintiff that he was also to submit to a fitness-for-duty examination to determine his ability to perform his duties as a criminal investigator (Def.Ex. 40). Brown explained that the request was based on the plaintiff's extended sick leave for various medical and psychological conditions (*id.*).

On June 25, 2001, the plaintiff filed another E.E.O. complaint with the Treasury Department, claiming that he was discriminated against based on his sex in that his service gun had been removed while female employees out on maternity leave had been able to keep their guns. He also alleged that the gun removal was in retaliation for his E.E.O. complaint alleging sexual harassment by Tischler (Plt.Ex. 35).

The plaintiff submitted an additional annual leave request for the period of June 28, 2001, through July 13, 2001 (Def.Ex. 41). Brown approved the request (*id.*). In a letter dated July 13, 2001, the plaintiff informed Brown that he had completed the required physical on June 21, 2001, and that he was going to begin traveling to Los Angeles on July 16, 2001 (Plt.Ex. 19). However, the plaintiff did not go to Los Angeles because he had not been cleared to return to work.

On September 12, 2001, Dr. Haviva Goldhagen, a physician with the Law Enforcement Medical Programs, concluded that the plaintiff was fit for duty (Plt. Ex. 27, p. 9; Def. Ex. 44, p. 7). Further, Dr. Goldhagen determined on October 4, 2001, that the plaintiff's wife was able to relocate to Los Angeles and that the move would not be life threatening (Plt. Ex. 27, p. 13; Def. Ex. 45, p. 4). Dr. Goldhagen reasoned that Mrs. Sauvage was receiving maintenance therapy and that there are numerous competent medical specialists in Los Angeles that would be able to treat Mrs. Sauvage. Dr. Goldhagen opined that there was no compelling medical evidence that Mrs. Sauvage's condition would be adversely affected by the move (Plt. Ex. 27, pp. 12–13; Def. Ex. 45, pp. 3–4).

On October 5, 2001, Varrone sent a letter informing the plaintiff that the hardship review board did not approve his request and that he was to report to Los Angeles no later than October 10, 2001 (Plt. Ex. 27, p. 2; Def. Ex. 47). The plaintiff flew to Los Angeles and arrived on October 10, 2001.

The plaintiff testified that upon his arrival he demanded that he be able to return to Florida in order to pick up his personal belongings, including his car (Doc. 111, p. 22; Doc. 112, p. 122). Brown permitted the plaintiff to return to Miami on October 11, 2001. He then drove to Los Angeles and reported for duty on October 25, 2001 (Doc. 111, p. 23; Doc. 112, p. 123; Def. Ex. 49).[10] Brown gave the plaintiff a

---

10. Brown testified that she thought he reported on October 24, 2001 (Doc. 112, p. 123).

special gun-range day in order for him to qualify and reacquire his gun (Doc. 111, p. 31). The plaintiff qualified, and his service weapon was returned.

As an Associate SAIC in Los Angeles, the plaintiff was assigned responsibilities for several resident-agent offices. The offices included the Los Angeles airport and Las Vegas, but not the Los Angeles port (Doc. 110, p. 154; Doc. 112, p. 135; Def. Ex. 5). The plaintiff testified that he had significantly less duties in Los Angeles than he did in Miami.

The plaintiff only worked in the Los Angeles office for about one month. On November 7, 2001, the plaintiff wrote a letter to Varrone notifying him that he was going to retire on December 2, 2001 (Def.Ex. 49). The plaintiff requested a waiver of his relocation expenses since he had not stayed in Los Angeles for a twelve-month period (*id.*).[11] Varrone granted the plaintiff's waiver (Def.Ex. 50). Subsequently, the plaintiff took leave from November 27, 2001, until his retirement date (Doc. 111, p. 24).

On February 27, 2002, the plaintiff, along with six other plaintiffs, filed suit against the defendant Secretary of the Treasury, who is currently John W. Snow, alleging violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. 621 *et. seq.*, including claims of retaliation (Doc. 1). The six other plaintiffs settled with the government. On December 9, 2004, the parties consented to trial before me (Docs.89, 90). A non-jury trial was held on the issue of liability (*see* Doc. 94, p. 2). In accordance with Rule 52(a), F.R.Civ. P., this Order contains my findings of facts and conclusions of law.

## II.

The plaintiff alleges, among other things, that he has been discriminated against in violation of the ADEA.[12] A plaintiff, of course, may prove discrimination by direct evidence. However, the standard for direct evidence in this circuit is rigorous. *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358–59 (11th Cir.1999), *cert. denied*, 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000). Consequently, a plaintiff normally seeks to prove discrimination through the test set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[13]

Under *McDonnell Douglas*, the plaintiff must initially establish a prima facie case of discrimination, which creates a rebuttable presumption that he was unlawfully discriminated against. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied*, 522 U.S. 1045, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). In order to establish a prima facie case of age discrimination, the plaintiff must show: (1) that he was a member of the protected age group; (2) that he was subjected to adverse employment action; (3) that he was qualified to do the job; and (4) that he was replaced by a younger individual. *Chap-*

---

**11.** It was the Customs Service's policy that an employee was to reimburse the government for any travel and relocation expenses it paid if the employee did not stay in the directed reassignment location for twelve months (Doc. 110, pp. 36, 222; Doc. 111, pp. 24–25; Def. Ex. 10). The government could grant a waiver of that requirement (*see* Def. Exs. 49, 50).

**12.** This case was presented, and tried, as one alleging intentional discrimination. Conse-

quently, the citations in the plaintiff's post-trial memorandum to *Smith v. City of Jackson, Mississippi*, 544 U.S. 228, 125 S.Ct. 1536, 161 L.Ed.2d 410 (2005), a disparate impact case, are inapposite.

**13.** This framework is also applicable to age discrimination claims under the ADEA. *See Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir.2000) (*en banc*).

*man v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir.2000) (*en banc*). If the plaintiff makes such a showing, the burden then shifts to the defendant to produce a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the defendant articulates such a reason, the presumption of discrimination then drops from the case and the burden returns to the plaintiff to prove the ultimate fact of age discrimination. *Id.*

In general, the same principles apply to the plaintiff's claims of retaliation. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir.1993). To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that he was subsequently subjected to adverse employment action; and (3) that a causal link existed between the two events. *Bass v. Board of County Com'rs, Orange County, Fla.*, 256 F.3d 1095, 1117 (11th Cir.2001). If the plaintiff makes such a showing, the defendant has the burden of producing some legitimate, non-retaliatory reason for its actions. *Id.* at 1119. Upon such a production, the plaintiff must then establish that the employer's proffered reasons for its actions were a pretext for retaliatory conduct. *Sullivan v. National R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999), *cert. denied*, 528 U.S. 966, 120 S.Ct. 402, 145 L.Ed.2d 314 (1999).

■ At this stage of a case, the issue is no longer whether a plaintiff has demonstrated a prima facie case, but rather whether he has carried his burden of prov-

ing discrimination or retaliation. *See Combs v. Plantation Patterns, supra,* 106 F.3d at 1519 n. 11; *Gupta v. Florida Board of Regents*, 212 F.3d 571, 587 (11th Cir.2000), *cert. denied*, 531 U.S. 1076, 121 S.Ct. 772, 148 L.Ed.2d 671 (2001). Nevertheless, an articulation of the elements of a prima facie case of discrimination and retaliation illuminates the ultimate issues of discrimination and retaliation.

### III.

The plaintiff alleges that his transfer from Miami to Los Angeles was due to age discrimination. The evidence does not support this claim.

■ In the first place, the transfer did not constitute adverse employment action. The reassignment was a lateral transfer with the plaintiff retaining the same job title (Associate SAIC) and the same grade (GS–15) (Plt.Ex. 1).

■ The plaintiff asserted at trial that, although his pay grade was the same, it was more expensive to live in Los Angeles because, for example, California has a state income tax, whereas Florida does not. Even assuming that the government's locality pay differential does not cover the increased cost, the fact that the plaintiff's paycheck does not go as far in Los Angeles does not make the transfer an adverse employment action.[14] The plaintiff's employment compensation did not decrease due to the transfer and, in light of the locality pay differential, seemingly increased.[15] The determination of whether an adverse employment action has taken

---

14. Both the Miami and Los Angeles areas receive locality pay enhancements. *See* 5 C.F.R. 531.603(16), (17). The schedules of the Office of Personnel Management indicate that in 2000 the locality pay was between about $4,800 and about $6,200 more per year for GS–15 law enforcement officers in Los Angeles than in Miami. *See* the 2000 locality pay tables on *http://www.opm.gov/oca/05Tables/index.asp*

15. Notably, increased taxes were withheld from the plaintiff's paycheck as of July 16, 2001, the date he was to report to work in Los Angeles (Doc. 110, p. 207). He complained and the increased withholding stopped (*id.*). Thus, it may be that the plaintiff was receiving locality pay for Los Angeles, but not paying California taxes.

place cannot reasonably be based on non-employment related factors, such as the cost of living in an area (or the weather, or local attractions, or the presence of an NFL team). Otherwise, an employer could face problems staffing offices in cities deemed unattractive. Notably, the plaintiff articulates no contention in his post-trial memorandum based upon the comparative cost of living (or other life-style factors) between Miami and Los Angeles, and, thus, any such contention is not only meritless, but abandoned.

■ The plaintiff argues that the transfer constitutes an adverse employment action because his job assignment in Los Angeles did not fully utilize his skill and experience in drug interdiction. This claim of adverse action, however, does not pass the threshold level of substantiality. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir.2001). In *Davis*, the Eleventh Circuit held that "to prove adverse employment action ..., an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* (emphasis in original). The court of appeals added that the employee's subjective view of the action is not controlling, but rather the action must be materially adverse as viewed by a reasonable person in the circumstances. *Id.* In other words, the test for an adverse employment action is an objective one. *Doe v. Dekalb County School District*, 145 F.3d 1441, 1448–49 (11th Cir. 1998).

To the extent that the plaintiff is contending that the mere transfer from the Miami office to the Los Angeles office is an adverse employment action, that contention is meritless. On its face, such a transfer would not result in a loss of prestige. Moreover, Tischler testified that the move did not involve a loss of stature (II Tischler Dep., p. 486). I accept Tischler's testimony and find that it demonstrates that a reasonable person would conclude that the plaintiff's transfer from the Miami office to the Los Angeles office did not produce a loss of prestige or stature.

On this point, as well as a number of others, I find Tischler's testimony credible and persuasive.[16] Tischler had great experience and, thus, a depth of knowledge about the matters at issue. Further, she was forthright and candid in her testimony; she appeared to tell it like she saw it. In addition, Tischler did not make any of the decisions under attack and, therefore, was not in a position of defending some action she had taken. Also, she had retired from the Customs Service and had entered the private sector (I Tischler Dep., p. 7).

It might be argued that Tischler was biased against the plaintiff because he had filed a charge of sexual harassment against her. The evidence reflects that the plaintiff and Tischler had a friendly relationship beginning in 1977, when they dated, until mid-May 2000, when the plaintiff stopped calling Tischler for help with the directed reassignment (seemingly because he concluded she could not assist him). Nevertheless, the plaintiff filed an E.E.O. complaint in August 2000 alleging that Tischler had subjected the plaintiff to sexual harassment for a long period of time (II Tischler Dep., p. 496).[17] Tischler consid-

**16.** Tischler was unable to testify at trial. The plaintiff therefore dumped into the record Tischler's three-volume deposition, as well as a deposition taken in an administrative matter, without designating just the pertinent portions, and, notably, without asserting any objections. This approach was remarkable be-

cause, in my view, Tischler's unobjected-to depositions strongly support the defendant.

**17.** The sexual harassment complaint was not introduced in evidence, but Tischler briefly mentioned it. Although the merit of such a complaint is not presented here, evidence in the case raises obvious questions about it:

ered the complaint frivolous and malicious (*id.* at p. 497). She thought that the plaintiff had filed the complaint in order to get a settlement that would relieve him from going to Los Angeles (*id.*). These thoughts could potentially affect Tischler's testimony adversely to the plaintiff. However, my reading of all volumes of Tischler's depositions convinces me that on the material issues in this case her testimony is forthright, unbiased and credible. Consequently, Tischler's testimony demonstrates that the plaintiff's lateral transfer from Miami to Los Angeles did not result in a loss of prestige or stature.

The plaintiff also complains that the job he was assigned by Brown in Los Angeles did not take full advantage of his skills and experience. Assuming that the plaintiff's feelings about the job he was to perform are relevant, I reject this complaint as a *post hoc* rationalization. The plaintiff's objection to the transfer was based on his desire to remain in South Florida and had nothing to do with the tasks he would be assigned in Los Angeles. If the plaintiff had a problem with his role in Los Angeles, he should have shown up (on time) and discussed the matter with Brown. There is no evidence that the plaintiff ever talked meaningfully with Brown about modifying his duties to take advantage of his perceived skills and experience. *See Garner v. Wal–Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir.1987) (explaining that it would have been reasonable for the employee *to discuss her working situation*, and an employee has an obligation not to assume the worst).

■ In all events, a lateral transfer of an employee into a job that he or she does not like as well as the prior job does not constitute an adverse employment action. *Brown v. Brody*, 199 F.3d 446, 455–57 (D.C.Cir.1999); *Williams v. Bristol–Myers Squibb Co.*, 85 F.3d 270, 274 (7th Cir.1996); *Lawrence v. Wal–Mart Stores, Inc.*, 236 F.Supp.2d 1314, 1329–31 (M.D.Fla.2002). As Judge Posner stated in *Williams,* "[o]therwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." 85 F.3d at 274. Accordingly, the Eleventh Circuit held in *Gupta v. Florida Board of Regents, supra,* 212 F.3d at 587–88, that a university's failure to assign an instructor to a desired class did not constitute an adverse employment action. Similarly, Brown's failure to assign the plaintiff to a role that he might have preferred does not amount to an adverse employment action.

In sum, the directed reassignment from Miami to Los Angeles was purely a lateral transfer. Nothing about it rises to the level of adverse employment action.

■ The plaintiff argues that the transfer to Los Angeles resulted in a constructive discharge. The defendant acknowledges that a constructive discharge would constitute an adverse employment action (Doc. 119, p. 12). The plaintiff failed to prove, however, that his retirement was due to working conditions that support a claim of a constructive discharge.

■ To show a constructive discharge, an employee must prove that the working

---

The alleged harassee called the alleged harassor numerous times in the Spring of 2000 seeking relief from the reassignment; an anonymous letter complained that the plaintiff was getting *favorable* treatment from Tischler; the two did not have a supervisor-subordinate relationship in the same office for a lengthy period of time, but only from March

1995 until March 1997 (II Tischler Dep., p. 481; III Tischler Dep., p. 711); and during the period of time they did work together, the plaintiff stated that "[t]here was no sexual connotation and/or sexual contact or dating" (Plt.Ex. 4, Tr. p. 10). The plaintiff withdrew the complaint in the Spring of 2002 (II Tischler Dep., p. 497).

conditions were so difficult or unpleasant that a reasonable person in the employee's position would have felt compelled to resign. *Wardwell v. School Board of Palm Beach County, Fla.*, 786 F.2d 1554, 1557 (11th Cir.1986). In other words, the burdens of the working conditions must rise to the intolerable level. *Id.* at 1558.

The plaintiff's actual working conditions plainly were not intolerable. As previously explained, the lateral transfer to Los Angeles did not constitute an adverse employment action. Since the working conditions in Los Angeles were not even adverse, *a fortiori*, they were not intolerable.

■ The plaintiff predicates his claim of constructive discharge upon his wife's medical condition. However, the law does not support a claim of constructive discharge where the burdens are caused by personal circumstances and not working conditions. *Bradford v. Norfolk Southern Corp.*, 54 F.3d 1412, 1417 (8th Cir.1995); *Cherchi v. Mobil Oil Corp.*, 693 F.Supp. 156, 163 (D.N.J.1988), *aff'd*, 865 F.2d 249 (3rd Cir.1988) (table).

The plaintiff points out that in *Bradford*, the Eighth Circuit stated in dictum that "under an appropriate set of facts a showing of personal circumstances could conceivably be relevant to a determination of constructive discharge." 54 F.3d at 1417. The plaintiff, however, misperceives the import of that statement. The relevance of personal circumstances would pertain to the employer's knowledge (*id.*), and thus may tend to support a claim of a discriminatory or a retaliatory animus.

Personal circumstances would not be relevant to the issue of whether an employee's working conditions are objectively intolerable. If they were, that would amount to a requirement on the employer to provide a reasonable accommodation for personal circumstances. The ADEA, however, imposes no such requirement. Moreover, the Americans with Disabilities Act, which does have a reasonable accommodation requirement, imposes that requirement only with respect to employees (or applicants) and does not extend it to family members. *See* 42 U.S.C. 12112(b)(5)(A). Consequently, Mrs. Sauvage's medical condition cannot provide the basis for a claim of intolerable working conditions.[18]

Furthermore, even though the Customs Service was not legally obligated to consider Mrs. Sauvage's condition in connection with the directed reassignment, it did so. Thus, the hardship review board, which is designed to provide a consistent, unbiased assessment of hardship issues (II Tischler Dep., p. 322), subsequently assessed the wife's medical condition and declined to overturn the directed reassignment (Plt. Ex. 27, pp. 2, 15–16, 17). It seems inappropriate for me to second-guess that determination. *Damon v. Fleming Supermarkets of Florida, Inc., supra*, 196 F.3d at 1361 (Courts "are not in the business of adjudging whether employment decisions are prudent or fair."); *Elrod v. Sears, Roebuck and Co.*, 939 F.2d 1466, 1470 (11th Cir.1991) ("[C]ourts 'do not sit as a super-personnel department that reexamines an entity's business decisions.'").

And even if I were authorized to reconsider the hardship request, I would not conclude that the board's determination was wrong. The board had before it the opinion of a medical advisor who, after

---

**18.** It is appropriate to note that the *Bradford* dictum indicated that personal circumstances were relevant only if known by the employer. Here, Varrone and Figueroa testified that they were not aware of the wife's condition at the time of the directed reassignment (Doc. 111, p. 134; Doc. 112, p. 26), and there is no evidence that Kelly had knowledge of that situation.

reviewing documentation submitted in support of the request, opined that the plaintiff's wife's medical condition "would not be significantly affected by relocation" (Plt.Ex. 27, p. 13). In addition, Tischler, who was a social friend of the plaintiff's wife (II Tischler Dep., p. 472), stated that it would not be a hardship for the wife to transfer her medical treatment to Los Angeles (Tischler MSPB Dep., p. 42). Tischler also said that, when she was with her, the plaintiff's wife seemed fine (II Tischler Dep., p. 473). In the face of the information from Tischler and the medical advisor, the plaintiff has failed to adduce evidence that was persuasive enough to demonstrate that the hardship review board's decision was erroneous.

In addition, the plaintiff's claim of a constructive discharge is refuted by his statement in the hardship request of May 21, 2000, that he intended to retire from Customs on August 30, 2001, when his retirement home became available following an eighteen-month lease (Def.Ex. 14, p. 3).[19] Since he actually retired after that date, his retirement was not due to a constructive discharge, but to his own retirement plans. While the plaintiff sought to provide an explanation at trial to avoid his stated retirement date, I reject that explanation as not credible. Furthermore, the fact that the plaintiff stayed on beyond his announced retirement date does not demonstrate that he had changed his retirement plans. Rather, the inference I draw from the circumstances is that the plaintiff stayed on beyond August 30, 2001, not because of any change of plans, but because he was out on leave in Miami. Therefore, I find that August 30, 2001, was the date the plaintiff intended to retire,

and, since he stayed on beyond that date, there could be no constructive discharge.

The plaintiff therefore has failed to prove that he suffered an adverse employment action. This failure is sufficient to defeat the plaintiff's claim of age discrimination based on the directed reassignment.

■ The claim fails, in addition, because the plaintiff has not proven that the reassignment was made with discriminatory intent. To the contrary, the defendant, although he had no burden to do so, has proven that the reassignment was directed for legitimate, non-discriminatory reasons.

When Kelly was Commissioner of the Customs Service, he thought things were "screwed up at Customs" (I Tischler Dep., p. 19). Accordingly, he wanted to shake things up in the field and transfer people around (Tischler MSPB Dep., p. 21). It was plainly reasonable for Kelly to think that performances could be improved by transfers of criminal investigators who had grown stale in their current positions or who were having problems with their supervisors. Importantly, there was no evidence at all suggesting that Kelly's approach was motivated to any degree by improper considerations, such as age discrimination.

Further, when Varrone on March 13, 2000, asked for names to be included on a list for directed reassignments, he was simply carrying out the request of the Commissioner's office for such a list. There is no evidence that Varrone suggested any improper criterion, such as age, for determining inclusion on the list.

In addition, when Figueroa, the SAIC in Miami, received the request for names, he submitted the plaintiff's name because he

---

**19.** The plaintiff offered in evidence a second copy of this letter which had handwritten on it "(New Date Feb. 2004)" in place of August 30, 2001 (Plt.Ex. 8, p. 3). The plaintiff testi-fied that he did not write that on the letter (Doc. 110, p. 225). Consequently, that writing will be disregarded.

considered the plaintiff a management problem, although the problem had not reached the level where discipline was warranted. Figueroa testified that the plaintiff was like a pebble in a shoe: He was a constant irritant but Figueroa could still work (Doc. 111, p. 123). Figueroa, moreover, gave some specifics of his problems with the plaintiff. Thus, he testified that the plaintiff was holding up paperwork, mentioning one example where a payment to a confidential informant was stalled (*id.* at p. 119). Also, when Figueroa proposed rotating job assignments among the Associate SAICs, the plaintiff not only opposed the idea, but went over Figueroa's head and complained to Assistant Commissioner Tischler about it (*id.* at pp. 121–22).

I accept this testimony as accurate and credible and find that the plaintiff's name was placed on a list for directed reassignment because he was causing management problems for Figueroa. Further, I find that improper considerations, such as age, played no part in including the plaintiff's name on the list.

In addition, the assignment to Los Angeles was not based on any improper consideration, including age. The evidence establishes that there were two Associate SAIC positions open at the time: Los Angeles and El Paso. Varrone assigned the plaintiff to Los Angeles because that office, which Varrone viewed as underperforming, had a new SAIC in Brown. Varrone thought that Brown could benefit from the plaintiff's skills. I find that this was the sole reason Los Angeles was selected for the plaintiff's new assignment.

In short, the defendant has not only articulated a legitimate non-discriminatory reason for the directed reassignment, but he has proven by a preponderance of the evidence that the articulated reason was the sole basis for the transfer. The plaintiff's evidence of age discrimination, on the other hand, was totally lacking in substance.

The plaintiff's theory of age discrimination is that the Office of Investigations was facing a "bubble" in the number of supervisory special agents that would be eligible for retirement, or facing mandatory retirement at age 57, during the years 2004–2006, and that the Customs Service dealt with that problem by driving the retirement-eligible agents into retirement, so that younger agents could assume the positions and gain supervisory experience. There is no direct evidence supporting this theory. Thus, there is no testimony or documentary evidence stating that retirement-eligible agents should be forced into retirement. Moreover, there is no testimony or documentary evidence which, although not meeting the high standard for direct evidence, even suggests that the Customs Service had such a plan.

The Customs Service was aware by the beginning of 1998 that, like other federal law enforcement agencies, there was a retirement bubble that would peak in the years 2004–2005 (I Tischler Dep., pp. 39–42; Plt. Ex. 80). While the Customs Service knew of this situation, there is no evidence that its response to it was to induce agents to retire early. Moreover, in my view, such an approach would make no sense. Thus, it would be implausible for the Customs Service to devise (implicitly or silently) a plan to deal with the retirement bubble by driving supervisors into retirement years early and thereby deprive itself of needed experience prematurely. This assessment is corroborated by Tischler's testimony "that it availed them nothing to transfer people hoping they would retire because they need the experience" (I Tischler Dep., p. 174).

Further, the notion of a mass transfer of retirement-eligibles is not supported by the list of March 13, 2000, upon which the

plaintiff's name appeared. It seems that, of the twelve names on that list, only six were eligible for retirement (*id.* at p. 101). Consequently, that list does not suggest anything out of the ordinary and, thus, does not meaningfully support the plaintiff's claim of discrimination.

The plaintiff attempts to establish his claim by pointing to the statement of potential retirement benefits that accompanied the plaintiff's letter of directed reassignment (*see* Def. Ex. 8). However, the evidence establishes that the inclusion of the benefits statement was not part of a plan to induce people to retire. Dianne Sheperd, an employee in the Human Resources Management office, testified that it was her idea to include a benefits statement with the directed reassignment letter (Sheperd Dep., p. 59). Her thought was that this would be helpful to employees who needed to decide quickly whether to accept a transfer (*id.* at pp. 94–95). She added that, for those employees who were not eligible to retire, she included a statement of severance benefits (*id.* at p. 62). In light of this evidence, the retirement benefits attachment, which the plaintiff emphasized at trial, provides no support at all for the age discrimination claim.

The plaintiff seeks to get some mileage out of the fact that the header at the top of the retirement benefits report attached to the March 17 directed reassignment letter states "03/10/2000 2:11:12 PM" (Plt.Ex. 2, attach.). This statement of date and time was not explained at trial (Doc. 112, p. 44) and, thus, there was no evidence regarding its significance. Consequently, it does not indicate to me, contrary to the plaintiff's suggestion, that the plaintiff's benefits report was prepared in anticipation of a directed reassignment. From all that appears, the date and time on the document reflect nothing more than the time the human resources department last ran a computer program regarding benefits.

In all events, there is nothing about that unexplained header that causes me to infer that the plaintiff had been pre-selected for a directed reassignment. The evidence is uncontradicted that the request for, and the preparation of, the March 13 list took place within a few hours on one day subsequent to March 10.[20] Moreover, the unexplained header does not weaken the strong and persuasive evidence establishing that the plaintiff was placed on the list because he was causing management problems for Figueroa and that neither his age nor his retirement eligibility had anything to do with the placement.

The plaintiff also asserts that the vetting process was not carried out with respect to the March 13 list of names, suggesting, I suppose, that this deviation from the norm supports his claim. Vetting, which was initiated by Kelly, involves checking with the offices of Human Resources Management and Internal Affairs to see if there is something in a prospective transferee's record that would warrant not proceeding with the transfer (Doc. 112, p. 34; II Tischler Dep., pp. 363–65).

The evidence does not make clear whether the March 13 list was vetted. The plaintiff relies upon a statement in the memorandum transmitting the list, but that statement merely indicated that, at that point, vetting had not been done (Plt.Ex. 1). There was no evidence from anyone who would have been involved in the vetting process that vetting was not performed.

In any event, even if the list was not vetted, that would provide meager support, at most, for the plaintiff's claim. The Commissioner, of course, could decide that

---

**20.** Varrone was unclear whether the list was prepared on March 12 or March 13 (Doc. 112, p. 41). Since March 12 was a Sunday, I find that the events occurred on March 13.

vetting of the list was not necessary for various reasons. Consequently, it would require gross speculation to think that the reason that the people on the March 13 list (half of whom were not retirement eligible) were not vetted was because the list was prepared to transfer retirement-eligibles in the hope that they would retire.

The plaintiff, in short, has not provided any significant probative evidence of intentional discrimination. The plaintiff's weak showing certainly cannot prevail in the face of the defendant's evidence of a legitimate, non-discriminatory reason for the directed reassignment.

 Moreover, the plaintiff's failure to prove intentional discrimination defeats his claim of a constructive discharge. Liability for a constructive discharge obviously depends upon a showing of intentional discrimination. *See Fitz v. Pugmire Lincoln–Mercury, Inc.*, 348 F.3d 974, 977 (11th Cir.2003) ("A constructive discharge occurs when a discriminatory employer imposes" intolerable working conditions); *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 660 (7th Cir.2001), *cert. denied,* 537 U.S. 819, 123 S.Ct. 96, 154 L.Ed.2d 27 (2002) (holding no constructive discharge where there was no evidence linking intolerable conditions to a discriminatory animus). Thus, even if an employee's working conditions are so intolerable that he is forced to quit, there is no liability under the anti-discrimination laws without proof of discrimination.

The plaintiff, consequently, has plainly failed to prove his claim of age discrimination. Thus, he has not demonstrated that the lateral transfer to Los Angeles was an adverse employment action, or that it resulted in a constructive discharge. Further, he did not show that the transfer was

made with a discriminatory intent. Accordingly, that claim will be dismissed.

## IV.

 The plaintiff argues, in addition, that he was constructively discharged in retaliation for filing E.E.O. complaints, which, according to the evidence, were submitted on June 7, 2000, and June 25, 2001 (Plt.Exs.34, 35).[21] The defendant rightly asserts that the plaintiff's retaliation argument is unclear. Thus, at the beginning of the plaintiff's post-trial memorandum, he contends that "Plaintiff's retaliation consisted of the Defendant denying his Hardship Review Board claim because of his wife's major illnesses, requiring him to undergo various physical and psychological examinations with respect to his fitness for duty, requiring him to relinquish his firearm, and requiring him to report for duty in Los Angeles within an unreasonably short period of time in clear violation of federal travel regulations" (Doc. 115, pp. 1–2). However, the only retaliation argument that the plaintiff developed in his memorandum was that he "Was Constructively Discharged In Retaliation For Filing His EEO Complaints" (*id.* at pp. 13–17).

 The plaintiff was told at the close of the trial (Doc. 112, pp. 155–56) and advised further in a written Order (Doc. 109) that his post-trial memorandum must identify each adverse employment action and must identify the evidence in the record showing that the action was motivated by a discriminatory or retaliatory intent. The plaintiff was warned that any claim of adverse employment action that is not presented in that format will be deemed abandoned (Doc. 112, pp. 155–56). Particularly in view of this warning, the only claim of

---

**21.** The retaliation claim, which is principally based on the denial of the hardship request in October 2001, does not appear to have been

raised in an E.E.O. complaint. The defendant, however, has failed to assert a defense on that ground.

retaliation that survives and thus the only one that warrants discussion is the contention that the plaintiff was constructively discharged in retaliation for filing E.E.O. complaints. As an aspect of this, the plaintiff argues that the hardship review board erroneously denied his request for relief, so that this argument will be addressed (but not as a distinct claim). On the other hand, the allegations regarding the retrieval of the gun, the fitness-for-duty exams, and the reporting-for-duty date are deemed abandoned.[22]

On the claim of a retaliatory constructive discharge, the plaintiff has satisfied the initial element by showing that he engaged in protected activity by filing E.E.O. complaints. Thus, the plaintiff introduced in evidence E.E.O. complaints filed on June 7, 2000, and June 25, 2001 (Plt.Exs.34, 35).

However, the plaintiff cannot establish the next element, which is that he suffered an adverse employment action. Of course, the claim of retaliation cannot be based on the directed reassignment since that event occurred before the plaintiff filed his E.E.O. complaints. Accordingly, he contends that his retirement was, in essence, a constructive discharge. However, as previously explained, the plaintiff's working conditions in Los Angeles did not even amount to adverse employment action and, thus, they certainly did not reach the level of intolerability that is required to establish a constructive discharge.

Consequently, the plaintiff's "claim of constructive discharge retaliation relies principally on the facts surrounding Defendant's denial of Sauvage's second hardship request" (Doc. 115, p. 14).[23] On this point, the plaintiff primarily contends that the hardship board's decision was wrong (*id.* at pp. 14–17). In making this contention, the plaintiff ignores that the pertinent policy states that "[h]ardship requests of employees who receive a directed reassign-

**22.** These three claims, in all events, are meritless, if not frivolous. The retrieval of the gun, which was the property of the Customs Service, was not an adverse employment action, since the plaintiff was on extended leave at the time and not working. *See Benefield v. Fulton Co., Ga.,* 130 Fed.Appx. 308 (11th Cir. 2005) (take-home car); *Reckard v. County of Westchester,* 351 F.Supp.2d 157, 162 (S.D.N.Y.2004) (gun suspension); *Simmons v. Dept. of Central Management Services,* 2004 WL 2584801 *7 (N.D.Ill.2004) (gun turned in). Further, I find, based on Brown's testimony, that the gun was retrieved not because of any retaliatory motive, but because the plaintiff was no longer qualified to have the gun and, more importantly, because he had psychological problems (Doc. 112, pp. 116–18, 129).

A fitness-for-duty examination after an extended period on sick leave does not amount to an adverse employment action. Furthermore, I find that the examinations were intended merely to determine whether the plaintiff was qualified, and were not motivated by a retaliatory intent.

The short period for reporting for duty was not an adverse employment action because it was immediately corrected by permitting the plaintiff to go back to Miami and then return to Los Angeles two weeks later. *See Gupta v. Florida Board of Regents, supra,* 212 F.3d at 588. Further, the early reporting date was set by the pertinent SAICs and someone in the Office of Administration, and not by Varrone (Doc. 112, p. 74). Particularly in light of that circumstance, I find that a retaliatory motive played no role in setting the reporting date (which, notably, was more than fourteen months after the plaintiff initially agreed to report and more than two months after he said he was going to begin traveling to Los Angeles (*see* Plt. Ex. 19)).

**23.** To a significant extent, the plaintiff in his argument gripes about the amount of documentation he was required to submit and the time within which he was to submit it (Doc. 115, p. 14). Since the documentation was, in fact, submitted prior to the board's decision, those gripes are plainly immaterial to a claim of constructive discharge. The argument contains other immaterial complaints as well.

ment will not be considered, except under extreme circumstances" (Def.Ex. 35, p. 3).

■ In any event, as explained previously, this court is not authorized to second-guess the hardship review board's decision. *Damon v. Fleming Supermarkets of Florida, Inc., supra,* 196 F.3d at 1361; *Elrod v. Sears, Roebuck and Co., supra,* 939 F.2d at 1470. As also explained earlier, even if I were authorized to reexamine the board's decision, the plaintiff has failed to persuade me, in light of the information from Dr. Goldhagen and Tischler, that the board erred in concluding that the plaintiff had not made the showing of "extreme circumstances" that are needed to cancel a directed reassignment. Consequently, the plaintiff's challenge to the board's decision does not support his claim of a constructive discharge.

Furthermore, the claim of a constructive discharge is also defeated by reasons stated previously in connection with the discrimination allegation. Thus, the plaintiff must base a constructive discharge upon objectively intolerable working conditions, and cannot predicate it upon personal circumstances, such as the wife's medical condition. In addition, the claim of a constructive discharge is refuted by the plaintiff's statement that he intended to retire on August 30, 2001, since I find that the plaintiff terminated his employment relationship due to this intent to retire, and not due to intolerable working conditions.

The plaintiff, therefore, cannot sustain his contention that he was constructively discharged. Importantly, that was the only employment action about which the plaintiff articulated an argument in his post-trial memorandum in support of his retaliation claim. Consequently, the retaliation claim fails because the plaintiff did not establish that, in retaliation for filing E.E.O. complaints, he suffered an adverse employment action.

■ Moreover, I reject the retaliation claim on the separate ground that the plaintiff has failed to prove a retaliatory animus. The retaliation claim was developed only with respect to an alleged constructive discharge, and this in turn focused on the hardship denial. Accordingly, the only employees of the Customs Service that could have a retaliatory motive that would be relevant to the hardship denial would be the members of the hardship review board and Varrone, who concurred in the denial.[24]

The hardship review board consisted of eight members, which included three voting members, two co-chairs, two advisors and a facilitator (Plt.Ex. 27, p. 15). At the time of the plaintiff's review, the co-chairs were John Eichelberger and Joel Geisner (*id.*). The voting members were Jeffrey Casey, George Evancheck and Richard Mercier (*id.*). The advisors were Sue Balboa and Mathew Riley, with Mark Skinner as the facilitator (*id.*).

There was no testimony at the trial from the three voting members, co-chair Geisner, the advisors, the facilitator, or anyone else demonstrating that any of these board members had knowledge of the plaintiff's E.E.O. activity. Specifically, and importantly, there is no evidence that any of the voting members of the board had knowledge of the plaintiff's E.E.O. complaints. In the absence of such knowledge, the voting members obviously could not have been retaliating against the plaintiff for E.E.O. activity. *Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791, 799 (11th Cir.2000), *cert. denied,* 532 U.S.

---

**24.** If Dr. Goldhagen had a retaliatory animus, that would also be relevant. There is no evidence that Dr. Goldhagen knew, or even cared, about the plaintiff's E.E.O. complaints. Understandably, the plaintiff makes no suggestion that she had a retaliatory motive.

1037, 121 S.Ct. 1998, 149 L.Ed.2d 1001 (2001).

Furthermore, there is no evidence that anyone with knowledge of the E.E.O. complaints had influenced the votes of the voting members. In particular, although Eichelberger, a co-chair of the board, had knowledge of the plaintiff's first E.E.O. complaint in June 2000 (Eichelberger Dep. of 4/2/02, pp. 10–11), no evidence was adduced indicating that he influenced the voting members in any way in their decision concerning the plaintiff's hardship request. Further, Varrone specifically testified that he had no discussions with the voting members regarding the hardship request (Doc. 112, p. 76). Consequently, I find that the record is devoid of any basis for concluding that the hardship review board's decision was motivated to any degree by a retaliatory animus.

Varrone knew at least about the remote E.E.O. filing of June 2000 (*id.* at p. 49), and he concurred in the recommendation that the hardship request be denied. He testified that in such matters he takes the recommendation of the physicians (*id.* at p. 84). He said further that his determinations "are based only on the medical issues involved" (*id.* at p. 85). Significantly, there is no evidence indicating otherwise. Consequently, I accept Varrone's testimony on this point as credible and find that Varrone based his concurrence with the denial of the hardship request solely upon Dr. Goldhagen's recommendation and was not influenced in any way by a retaliatory motive.

The plaintiff also seeks to support his retaliation claim by reference to comparator evidence. Specifically, the plaintiff points to the example of an approved hardship request that Eichelberger mentioned concerning an agent whose child needed special care at a hospital in Dallas (Doc. 115, p. 15).

■ Comparator evidence may give rise to an inference of a discriminatory or retaliatory motive if, among other things, individuals are similarly situated and one is treated more favorably than the other. *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1091 (11th Cir.2004). The plaintiff's reliance on Eichelberger's brief summary description is insufficient to demonstrate that the plaintiff's wife and the sick child were similarly situated. In the first place, it appears that the child's treatment was available in Dallas, but not Washington, D.C. (the proposed city of transfer), while the wife's treatment was available in both Miami and Los Angeles.

Furthermore, the plaintiff did not show that the decision-makers were the same in both instances. Thus, there is no indication that the voting members of the board were the same in the two cases. More significantly, it does not appear that Varrone was the concurring official in the child's case, since he testified that he did not recall approving any hardships (Doc. 112, p. 81). In view of the lack of a showing that Varrone had approved a hardship request—and that he did so in circumstances similar to the plaintiff's—there is no basis for inferring that Varrone acted with a retaliatory intent when he denied the plaintiff's request. In other words, the plaintiff's purported comparator evidence would not even establish a prima facie case of retaliation, much less satisfy the plaintiff's burden of proving retaliation by a preponderance of the evidence.

In sum, the plaintiff has failed to sustain his claim of retaliation. As indicated, the only argument that was developed on this point, and thus the only argument that was not abandoned, is the contention that he was constructively discharged in retaliation for filing E.E.O. claims. This contention is rejected because, for several reasons, the plaintiff has not proven that he

was constructively discharged. In addition, the plaintiff has failed to show that either Varrone or any other decision-maker acted with a retaliatory animus toward the plaintiff.[25]

It is, therefore, upon consideration,

ORDERED:

That the complaint in this case shall be DISMISSED. Accordingly, judgment shall be entered against the PLAINTIFF and in favor of the DEFENDANT.

25. The plaintiff has filed with his post-trial memorandum a decision from the District of Oregon granting relief to another Customs Service special agent, James R. Poland. The defendant objects to that submission (Doc. 119, p. 19 n.24), and I will sustain that objection. I tried the plaintiff's case, not Poland's. To the extent that Poland had anything relevant to say about the plaintiff's case, I received that testimony. Accordingly, the Poland decision will be deemed stricken.